[No. 39215-1-II. Division Two. May 6, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. RENEE RAY CURTISS, *Appellant.*

674

678

*Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Thomas C. Roberts, Deputy*, for respondent.

¶1 QUINN-BRINTNALL, J. — A jury found Renee Curtiss guilty of the premeditated first degree murder of Joseph Tarricone. In 1978, Tarricone disappeared after visiting Curtiss's mother's Canyon Road, Puyallup, rental home. In 2007, during a construction excavation, mutilated human remains were discovered buried in the Canyon Road property. Nicholas Notaro, Curtiss's brother, confessed that in 1978, he lured Tarricone into his mother's basement, shot him twice in the back of the head, and then put the body in a freezer. Curtiss and Notaro both confessed that they and their mother, who has since died, dismembered Tarricone's body using a chainsaw and buried the remains in the backyard.

¶2 Curtiss appeals, challenging (1) the admission of her taped police confession, (2) comments on her right to remain silent, and (3) the admission of improper opinion testimony at trial. Curtiss also asserts that (1) prosecutorial misconduct and (2) ineffective assistance of counsel taint her conviction. In a statement of additional grounds for

review (SAG),[1] Curtiss challenges the sufficiency of evidence supporting her conviction, the State's use of "crowd manipulation" tactics to influence the jury, and the trial court's authority to impose a 40-year mandatory minimum sentence.

¶3 We hold that (1) the trial court correctly admitted Curtiss's knowing and voluntary statement; (2) Curtiss never invoked her right to remain silent, so no party could have improperly commented on it at trial; (3) sufficient evidence supports Curtiss's conviction; (4) police officer testimony recounting Curtiss's interrogation, even if improper, could not have affected the jury's verdict; (5) the State did not commit prosecutorial misconduct; (6) Curtiss's trial counsel was not ineffective; (7) Curtiss's alleged "crowd manipulation" error concerns matters outside the record; and (8) Curtiss's sentence is lawful. Accordingly, we affirm.

## FACTS

BACKGROUND

¶4 Joseph Tarricone was a travelling meat salesman from Alaska who had seven children. Gina Chavez last saw Tarricone, her father, in the summer of 1978, when they went out to eat during his visit to Seattle, a trip he frequently made to visit his girl friend, Curtiss. By the fall of 1978, all contact between Tarricone and his family abruptly ceased. Chavez eventually filed a missing person report with the Des Moines Police Department in March 1979. She directed the police to Curtiss and reported a Canyon Road, Puyallup, Washington, home as Tarricone's last known whereabouts.

¶5 Detective Jerry Burger of the Des Moines Police Department began an investigation. After Burger made several attempts to contact Curtiss, someone who self-identified as Curtiss called Burger. When Burger asked about Tarricone's whereabouts, Curtiss said she last saw

[1] RAP 10.10.

Tarricone in August or September 1978, when he showed up at her home with airline tickets for Rome, Italy. Curtiss told Burger that she refused to go on the trip and that Tarricone had thrown the tickets on the ground and left. Burger wrote a report and then transferred the case to Pierce County. The record contains no information about an investigation of Tarricone's disappearance from 1979 to 1990.

¶6 In 1990, Jacqueline "Gypsy" Tarricone began her own investigation into her father's disappearance. Gypsy[2] spoke with various Washington police departments, hired a private investigator, and personally contacted businesses on Tarricone's regular business travel routes to determine if anyone had seen him since 1978. A Pierce County detective spoke with Curtiss, and this time she stated that the last time she saw Tarricone, he showed her a briefcase full of money and asked her to marry him, and, when she declined, he left.

¶7 Suspecting Curtiss knew what happened to Tarricone, Gypsy and her brother, Dean Tarricone, devised a plan to get information from Curtiss. Gypsy and Dean[3] created a story about a life insurance policy that Tarricone had left to Dean and Curtiss. Dean called Curtiss's home pretending to be an insurance adjustor for the policy. Dean, as himself, called again later and spoke to Curtiss pretending that he had just learned about the life insurance policy. Dean lied many times during the conversation to try to catch Curtiss off guard and trick her into revealing information. Although Curtiss did not reveal any relevant information during the call, Dean recorded the phone conversation and turned it over to the police. Again, the record contains no information of an investigation of Tarricone's disappearance from 1990 to 2007.

¶8 On June 4, 2007, while excavating the land at the Canyon Road property, a utilities construction crew uncov-

---

[2] Because Jacqueline Tarricone shares the same last name as Joseph Tarricone, we will refer to her by her preferred first name, Gypsy, for clarity to the reader.

[3] Because Dean Tarricone shares the same last name as Gypsy and Joseph Tarricone, we will refer to him by his first name for clarity to the reader.

ered skeletal human remains buried in a black plastic bag. The black bag contained human bones, some clothing, a belt, rope, and twine. Over a period of several days, the police and the construction crew uncovered more bones, including a partial skull.

¶9 Detective Sergeant Ben Benson[4] of the Pierce County Sheriff's Office obtained a history of renters over the years. Specifically, he learned that Curtiss's mother, Geraldine Hesse, rented the property in 1978 and 1979. At trial, the property owner testified that Curtiss lived with her mother at the time.

¶10 Detective Benson received a tip from the King County Sheriff's Department about Tarricone's missing person report and its association with the Canyon Road address. This tip resulted in a forensic analysis of the bones. Based on a comparison of the bones' and Tarricone's sister's mitochondrial deoxyribonucleic acid (DNA), the Federal Bureau of Investigation (FBI) could not exclude that the bones were Tarricone's.[5] In addition, Dr. Eric Kiesel, Pierce County's chief medical examiner, testified that the bones were consistent with someone of Tarricone's gender, age, and size. Kiesel could not identify a method of death based on the parts of the bones discovered and listed the official cause of death as "homicidal violence, otherwise not specified." 6 Report of Proceedings (RP) at 266. But Kiesel did note that many of the bones were fragmented and had "tool marks" on them consistent with being cut by a saw or chainsaw. 6 RP at 258.

---

[4] Ben Benson is classified as a "Detective Sergeant" at the Pierce County Sheriff's Office. We refer to him simply as a "detective" even though we recognize there is a difference between these two classifications. We refer to Benson this way for ease to the reader and mean no disrespect.

[5] An FBI forensics expert testified about the analysis of the human remains and why the bones' mitochondrial DNA was used instead of nuclear DNA. Although nuclear DNA's highly individualized code can provide an exact identification of a body, it breaks down faster than mitochondrial DNA. But mitochondrial DNA is always passed from mothers to their children, so analyzing it allows only for a determination of whether a common ancestor exists among tested individuals. Accordingly, the age of the bones limited the available forensic techniques. The FBI could not definitively identify the bones as Tarricone's, but it also could *not exclude* that the bones were Tarricone's.

¶11 Detective Benson's investigation ultimately led him to believe that Curtiss and her family were involved in Tarricone's death. On March 24, 2008, Detectives Benson and Denny Wood[6] interviewed Curtiss at her workplace.[7] Even though she was not under arrest, Benson read Curtiss her *Miranda*[8] rights before asking her any questions. Benson and Wood told Curtiss that they had just arrested her brother for Tarricone's murder. Upon hearing Tarricone's name, Curtiss gasped; her neck, face, and ears turned bright red; and she "looked like she was in shock." 6 RP at 296.

¶12 Initially, Curtiss made several untaped statements describing her relationship with Tarricone. Curtiss stated that she and Tarricone met in Alaska, dated for one year, and became partners in his meat selling business. Curtiss claimed that Tarricone frequently gave her and her mother gifts and regularly asked her to marry him. Curtiss declined the marriage proposals, eventually ended the relationship, and moved to Washington to get away from Tarricone. Curtiss said that despite the move, Tarricone continued to pursue a relationship with her by regularly visiting her.

¶13 In the untaped portion of the interview, Curtiss also commented on several telephone conversations that she had with Notaro while he was in Alaska. Detective Wood testified that during these telephone conversations, Curtiss described her problems with Tarricone and said that "she wanted [Tarricone] to go away. She just wanted the problems to end and she wanted [Notaro's] help." 6 RP at 162. Wood also testified that Curtiss said Notaro told her, during a 1978 telephone conversation, that he had mur-

---

[6] Denny Wood is also classified as a "Detective Sergeant" at the Pierce County Sheriff's Office. We refer to Wood as a "detective" for ease to the reader and mean no disrespect.

[7] The police interviewed Robin Rose, Curtiss's sister, that same day. The record does not reveal if the police ever arrested Rose or if the State charged her with any crimes related to Tarricone's murder.

[8] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

dered his wife. This last telephone call occurred shortly after Notaro had an emergency appendectomy.

¶14 When Detective Benson asked about Tarricone's murder, Curtiss replied, "Yes, I did know about it" and "I don't know what I'm supposed to say." 6 RP at 165. After being told that she should tell the truth, Curtiss replied, "I don't know if I'm supposed to talk to an attorney." 6 RP at 165. The officers reminded her of her *Miranda* attorney rights, which she said she understood. Next, Detective Wood told Curtiss that the statute of limitations for rendering criminal assistance had expired.[9] Wood testified that he made this statement to "put her at ease" and to help keep her talking and that he knew Curtiss could still be charged with Tarricone's murder. 6 RP at 166.

¶15 After hearing the statute of limitations for rendering criminal assistance had expired, Curtiss answered more questions. The detectives asked her if she would provide a taped statement. Although Curtiss stated that she needed to attend her husband's doctor's appointment because he was having heart surgery the next day, she agreed to give a taped statement. The detectives read Curtiss her *Miranda* rights again after starting the recording. In her taped statement, Curtiss confessed to rendering criminal assistance by helping cover up Tarricone's murder. She stated that she received a phone call at work to come to her mother's home, where she was shown Tarricone's body. She admitted that she drove Notaro to buy a chainsaw, helped cut up the body, and later threw the gun Notaro used to kill Tarricone into Lake Washington. At the end of her taped statement, Curtiss acknowledged that she voluntarily gave all the information in her statement.

¶16 During the taped statement, Curtiss denied murdering Tarricone. Curtiss stated that she often complained to

---

[9] At the time, rendering criminal assistance to a relative after the commission of a class A felony could have resulted in a gross misdemeanor conviction. Former RCW 9A.76.070 (1975). The statute of limitations for all gross misdemeanors ran for two years. Former RCW 9A.04.080 (1975). Accordingly, Detective Wood provided Curtiss with accurate information.

Notaro about Tarricone's persistent pursuit of her. Although she could not remember discussing Tarricone or asking Notaro specifically for help in telephone conversations around the time of his appendectomy, Curtiss stated that at some point in the conversations she probably said something like "I wish [Tarricone] would go away or disappear." Clerk's Papers (CP) at 189. Curtiss stated that during telephone calls after his appendectomy, she asked Notaro to visit her for the purposes of his recuperation and to help her take care of their mother. Curtiss also changed her earlier, untaped statement about when she learned that Notaro killed his wife, indicating she learned about it either in a telephone call after his appendectomy *or* after he arrived in Puyallup. She denied providing Notaro with a gun to kill Tarricone and said that she believed he brought one with him from Alaska. The detectives repeatedly asked Curtiss if she was at the Canyon Road home during the murder, and she replied that she was not.

¶17 After completing the taped portion of the interview, Detective Wood told Curtiss that he did not believe her story. Wood told Curtiss that he believed she asked Notaro to kill Tarricone and was present during the murder. Curtiss did not initially respond to the accusations or deny them, but eventually responded saying, "I don't know if I was there. I can't remember" and "I don't think I was." 6 RP at 173. Detective Benson then arrested Curtiss for Tarricone's murder.

¶18 The State charged Curtiss with first degree murder, a class A felony under former RCW 9A.32.030 (1976) and RCW 9A.08.020. Curtiss moved to suppress her statements to Detectives Benson and Wood, citing deceptive interrogation tactics. After a CrR 3.5 hearing, the trial court ruled that *Miranda* applied and that the detectives were obligated to ensure only that Curtiss understood her *Miranda* rights. It then ruled that the police did nothing that overcame Curtiss's knowing, voluntary, and intelligent waiver of her rights and that her statements would be admissible at trial. The trial court entered formal CrR 3.5 findings of fact and conclusions of law on April 24, 2009.

¶19 A five-day jury trial commenced on March 25, 2009. The State presented 29 different witnesses, played Dean's 1990 taped phone conversation with Curtiss,[10] and played Curtiss's taped statement. After the State rested, Curtiss moved to dismiss due to insufficient evidence.[11] Curtiss argued that the State had presented no evidence of her knowledge or furtherance of Tarricone's murder. The trial court denied the motion.

¶20 Curtiss testified in her defense. Her testimony about her relationship with Tarricone was consistent with her pretrial taped statement. Curtiss testified that she remembered talking to her mother about her frustrating situation with Tarricone, but she did not remember talking about her problems with Notaro. She denied asking Notaro for help with or to hurt Tarricone. Consistent with her taped pretrial statement, she testified that she could not remember if she talked with Notaro about Tarricone during telephone calls around the time of Notaro's appendectomy. But during cross-examination, Curtiss stated that she might have discussed Tarricone with Notaro during these calls. Curtiss acknowledged her prior inconsistent statements about when she learned Notaro murdered his wife and clarified that she learned about it only after Tarricone's murder. She testified that she was not present during Tarricone's murder and learned about that murder after the fact. Curtiss again admitted to helping purchase a chainsaw, cutting up Tarricone's body, helping dispose of the remains, and throwing Notaro's gun into Lake Washington. She also admitted to frequently lying to police and to Tarricone's children over the years to cover up the murder.

¶21 Curtiss testified that she was "[v]ery anxious" during the police interrogation at her office because of her

---

[10] Curtiss moved to suppress the 1990 taped phone conversation. Based on governing New Mexico law, which applied because Dean initiated the phone call from Albuquerque, New Mexico, the trial court denied the motion.

[11] Although Curtiss's motion purported to request relief due to prosecutorial misconduct, the arguments presented in the motion were actually insufficient evidence claims.

husband's pending doctor appointment and heart surgery scheduled for the next day. 7 RP at 397. She acknowledged that she never asked for an attorney during the police interview, but she testified that she had wondered if she should speak to one. Curtiss also testified that after learning that the statute of limitations had expired for rendering criminal assistance, she continued speaking to the detectives because she believed that all her actions were covered by that charge.

¶22 Notaro also testified in Curtiss's defense. Notaro testified that after his September 1978 appendectomy, he shot and killed his wife on the side of an Alaskan road on their way home from the hospital,[12] and that he then flew to Washington to stay with his mother for a week. He testified that he did not remember talking with Curtiss about his visit and stated that he planned the trip in conversations with his mother. Notaro testified that he brought the gun he used to kill his wife with him to Washington because he planned to have Curtiss dispose of it. He also testified that he did not tell Curtiss about killing his wife until after Tarricone's murder.

¶23 At Curtiss's trial, Notaro admitted that during the week of his visit, he thought about how to kill Tarricone and dispose of the body because Tarricone was "messing around with" Curtiss. 7 RP at 485. He admitted that he lured Tarricone into the basement by asking for help to fix a washing machine, shot him twice in the head, went to a nearby store to rent some tools to lift up the body, and then placed the body in a freezer to reduce the mess when he cut it up. Notaro testified that he did not talk to or see Curtiss until she helped dispose of Tarricone's body. He also testified that Curtiss never asked him to harm Tarricone and did not help him commit the murder.

---

[12] Notaro was arrested in October 1978 for his wife's murder, pleaded guilty to manslaughter, and served prison time until 1986. Notaro testified at Curtiss's trial that he murdered his wife so that he would not have to split their property, valued at $2,500 to $3,000, in a divorce and so that he could begin a new relationship.

¶24 During cross-examination, Notaro admitted that he frequently lied to police about his wife's and Tarricone's murders. The State questioned Notaro on various inconsistencies in his statements about the body disposal process. The State also asked Notaro about statements that he made to a co-worker, Arlene Tribbett, around 1990, in which he had stated that (1) Curtiss asked him to kill her boyfriend, who was having an affair with Notaro's wife; (2) Curtiss lured her boyfriend into the basement of a Canyon Road house, where Notaro shot him; and (3) his sister and mother helped him dismember and dispose of the body by burying it under the front porch. Notaro denied making these statements to Tribbett, and the State impeached Notaro by calling Tribbett and the officers who had taken Tribbett's statement as rebuttal witnesses. Curtiss cross-examined Tribbett about inconsistencies in her description of the conversation over the years, including whether Curtiss asked Notaro to kill Tarricone and whether Curtiss lured Tarricone into the basement. The trial court instructed the jury that it could use the rebuttal evidence to "impeach[ ] Nicholas Notaro" but not as "proof of [Curtiss's] guilt or innocence." 8 RP at 541.

¶25 The jury found Curtiss guilty of first degree premeditated murder.[13] Noting that the date of crime occurred before the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, the trial court sentenced Curtiss to life in prison under former RCW 9A.32.040 (1975). Curtiss had no criminal history. Curtiss timely appeals.

¶26 The State moved for resentencing to impose a minimum sentence under former RCW 9.95.011 (2007). After receiving permission from this court, as RAP 7.2(e) requires, the trial court imposed a minimum 40-year term to Curtiss's sentence. Curtiss also appeals the imposition of this minimum term.

---

[13] Curtiss declined to have the trial court instruct the jury on the lesser included offense of second degree murder.

## ANALYSIS

ADMISSIBILITY OF CURTISS'S TAPED STATEMENTS

¶27 Curtiss assigns error to the admission of her post-*Miranda* taped police interview statements, asserting that she did not knowingly and voluntarily waive her *Miranda* rights. Specifically, she assigns error to the trial court's conclusion that Detectives Wood and Benson did not use deceptive tactics that "dilut[ed] the protections *Miranda* uarantees." Br. of Appellant at 35. We hold that Curtiss knowingly and voluntarily made her police interview statements.

¶28 We examine the totality of the circumstances to determine if statements made during a custodial interrogation were coerced by any express or implied promise or by the exertion of improper influences. *State v. Unga*, 165 Wn.2d 95, 101, 196 P.3d 645 (2008); *State v. Broadaway*, 133 Wn.2d 118, 131-32, 942 P.2d 363 (1997). This examination includes considerations of the location, length, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of her Fifth Amendment rights. *Unga*, 165 Wn.2d at 101. Police lies, promises, or misrepresentations during an investigation do not automatically render any resulting statements inadmissible. *Broadaway*, 133 Wn.2d at 132. But if the police tactics manipulated or prevented a defendant from making a rational, independent decision about giving a statement, the statement is inadmissible. *Unga*, 165 Wn.2d at 102; *Broadaway*, 133 Wn.2d at 132.

¶29 Here, Detective Wood's accurate statement about the expired statute of limitations for rendering criminal assistance did not override Curtiss's independent decision-making process or coerce her into giving a statement. At trial, Curtiss testified that she gave her taped statement because she knew "the participation that [she] had been involved with would be included in [the rendering criminal

assistance charge that Wood] said could not be charged." 7 RP at 398. Curtiss's testimony shows that she balanced competing interests and then knowingly and voluntarily gave her statement to the police limiting her admissions to events following Tarricone's murder. Curtiss's failure to realize the possible consequences of giving the statement does not change its voluntary nature. *State v. Heggins*, 55 Wn. App. 591, 598-99, 779 P.2d 285 (1989) (stating that the United States Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness' " when assessing the voluntariness of custodial statements (internal quotation marks omitted) (quoting *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987))).

¶30 Curtiss also argues that her statement during the interview, "I don't know if I'm supposed to talk to an attorney," shows that she did not understand her rights. 6 RP at 165.[14] She contends that her statement is a "clear indication that [she did] not fully understand her right to counsel and [sought] clarification." Br. of Appellant at 41. But immediately after making her attorney statement, the police reminded her of her *Miranda* rights, specifically her right to counsel, and she indicated that she understood her rights. Reviewing the entire circumstances of the interrogation, we hold that Curtiss knowingly, voluntarily, and intelligently made the taped statements describing her involvement in Tarricone's murder. The trial court did not err in admitting her taped statements at trial.

TRIAL REFERENCES TO CURTISS'S SILENCE DURING POLICE INTERROGATION

¶31 Next, Curtiss asserts that at trial Detective Wood impermissibly commented on her right to remain silent. Specifically, Curtiss challenges Wood's testimony that during her police interrogation, she did not react to or deny

---

[14] On appeal, Curtiss expressly waived any argument that her statement was a request for an attorney that should have ended the interrogation.

accusations that she (1) asked Notaro to kill Tarricone and (2) was present in the house at the time of the murder. But during the interrogation, Curtiss never invoked her right to remain silent. Accordingly, Wood's references to Curtiss's statements and conduct during the interview were not improper.

¶32 Curtiss's right to remain silent is contained within the Fifth Amendment, applied to the states via the Fourteenth Amendment to the United States Constitution, and article I, section 9 of the Washington Constitution. *State v. Easter*, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996). We give the same interpretation to both clauses and liberally construe the right against self-incrimination. *Easter*, 130 Wn.2d at 235-36. In Washington, a defendant's constitutional right to silence applies in both pre- and postarrest situations. *Easter*, 130 Wn.2d at 243; *State v. Belgarde*, 110 Wn.2d 504, 511, 755 P.2d 174 (1988). *Miranda* warnings themselves carry the implicit assurance that the defendant's silence will carry no penalty. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *Belgarde*, 110 Wn.2d at 511.

¶33 Here, the trial court entered CrR 3.5 findings, including finding of fact 66, stating that "[a]t no time throughout the interview with [Curtiss,] *including the exchange that occurred after the recorder had been turned off*, did [Curtiss] invoke her right to remain silent." 3 CP at 451 (emphasis added). Curtiss does not challenge finding of fact 66 and it is a verity on appeal. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). Because Curtiss did not invoke her right to remain silent during questioning, Detective Wood's testimony regarding her lack of a response to certain interview questions was not improper.

SUFFICIENCY OF EVIDENCE

¶34 Curtiss challenges the sufficiency of evidence supporting the jury's guilty verdict, contending that there is "no evidence that [she] had any knowledge of, or was present, until after the crime was committed." SAG at 20. We disagree.

¶35 Evidence is sufficient to support a conviction if, viewed in the light most favorable to the jury's verdict, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a trier of fact can draw from that evidence. *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness of evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

¶36 Under former RCW 9A.32.030(1)(a), in order to prove that Curtiss committed first degree murder, the State must prove that "[w]ith a premeditated intent to cause the death of another person, [s]he cause[d] the death of such person or of a third person." And under RCW 9A.08.020(3), a person is an accomplice to a crime if

(a) [w]ith knowledge that it will promote or facilitate the commission of the crime, he

(i) solicits, commands, encourages, or requests such other person to commit it; or

(ii) aids or agrees to aid such other person in planning or committing it; or

(b) His conduct is expressly declared by law to establish his complicity.

¶37 As an initial matter, Curtiss appears to argue that the evidence for each element of her crime must be separated from the evidence proving other elements. In determining whether evidence is sufficient to support a conviction, we review *all* the evidence in the record in the light most favorable to the jury's verdict. *Salinas*, 119 Wn.2d at 201.

 ¶38 Curtiss's main argument is the jury's apparent failure to believe her and Notaro's testimonies. She asserts that because she and Notaro testified to "the events surrounding the crime itself," the jury should have given their testimony greater weight. SAG at 21. Although the jury could have believed Curtiss's testimony, the jury saw her and Notaro testify and found them incredible. Over the course of the trial, both Curtiss and Notaro admitted that they had frequently lied to police and Tarricone's children for almost 30 years to cover up the murder. This long-term deception permitted the jury to question Curtiss's and Notaro's credibility and disregard all of their self-serving trial testimonies.

¶39 Moreover, Curtiss's pretrial statements, her trial testimony, and Notaro's trial testimony frequently conflicted. During the untaped confrontation part of her interrogation, Curtiss said that she could not remember if she was present during the murder, stating, "I don't know if I was there. I can't remember" and "I don't think I was." 6 RP at 173. But at trial, Curtiss unequivocally testified that she "was not in the house" when Tarricone's murder occurred. 7 RP at 409. Curtiss's various statements and Notaro's trial testimony also contained inconsistencies about whether postappendectomy telephone calls between them occurred and the contents of these conversations. Curtiss testified that she may have seen Notaro before the murder, whereas Notaro testified that they did not see each other in Washington until after the murder. Evaluating witnesses' credibility, the persuasiveness of evidence, and resolving conflicting testimony is the sole province of the jury, and we do not review its decisions.[15] *Camarillo*, 115 Wn.2d at 71; *Walton*, 64 Wn. App. at 415-16. The jury was not required to

---

[15] Although the jury makes credibility determinations, we note that our review of the record established that Curtiss admitted 11 separate times during her trial testimony that she lied to Tarricone's family and police over a period of 30 years to conceal the murder. In addition, Curtiss could remember the specifics of less memorable events from 1978, such as a credit union's attempts to collect payments from her for Tarricone's Mercedes, but frequently changed her story or stated that she could not remember whether she was present in her mother's home during Tarricone's murder or whether she heard gunshots.

accept Curtiss's and Notaro's testimonies as truthful, and it clearly did not do so.

¶40 Nor does Curtiss's lack of credibility defeat the evidence of Curtiss's guilt. We review the evidence and all reasonable inferences in the light most favorable to the jury's verdict. *Salinas*, 119 Wn.2d at 201. Based on the conflicting testimony, any reasonable juror could have believed that Curtiss called Notaro in Alaska, learned he was planning on killing his wife, complained about Tarricone, and asked Notaro to come to Washington and make Tarricone disappear. The jury could have found credible Curtiss's interrogation statement that prior to the murder, she may have told Notaro that she wished Tarricone "would go away or disappear." CP at 189. This evidence alone supports the jury's verdict finding Curtiss guilty as an accomplice for requesting that Notaro "disappear" Tarricone and then assisting in hiding the body and covering up the crime.

¶41 In addition, during her interrogation, Curtiss stated that Tarricone did not usually go over to her mother's house when Curtiss was not there. At trial, Curtiss testified that on the day of the murder she was at work and had no explanation for why Tarricone went to her mother's home during the day. Moreover, Curtiss testified that she could not be "100 percent sure" that she did not talk to Tarricone on the day of his murder. 7 RP at 409. Accordingly, the jury could have believed that because Tarricone was usually only at the Canyon Road house when Curtiss was there, either Curtiss was at the home or Curtiss facilitated the murder by inviting Tarricone to come over to her mother's house on the pretext that she would be there.

¶42 Several of Curtiss's statements about events that occurred after the shooting also support the jury's verdict. Curtiss testified that when she, Notaro, and their mother were sitting around the kitchen table talking about what to do with the body, "[i]t was almost like [Notaro] had planned, and it's like he had had time to think about it." 7 RP at 411. In light of Curtiss's testimony that Notaro knew Tarricone

only through her, and Curtiss's descriptions about the content of the postappendectomy telephone conversations she had with Notaro, the jury could reasonably infer that Notaro's plan to murder his wife and then Tarricone was developed in response to Curtiss's request for help in making Tarricone disappear.

¶43 Finally, the jury likely rejected Curtiss's and Notaro's self-serving testimony that only their mother, now deceased, orchestrated and killed Tarricone. Curtiss testified that her mother got along with Tarricone, liked him and the financial support and gifts he provided, and had encouraged his pursuit of Curtiss. Accordingly, the jury was free to disregard the self-serving assertions that Curtiss's mother planned and committed Tarricone's murder. Viewed in the light most favorable to the jury's verdict, any rational jury could find that Curtiss was an accomplice to Tarricone's murder and, therefore, sufficient evidence supports the jury's guilty verdict.

PROPRIETY OF POLICE TESTIMONY RECOUNTING CURTISS'S INTERROGATION

¶44 Curtiss also argues that Detective Wood's testimony, in which he recounted statements made during Curtiss's interrogation about her veracity and guilt, was improper opinion testimony that violated her jury trial rights. We hold that even if the statements were improper opinion testimony, Curtiss has failed to show prejudice from the admission of these statements and that she cannot raise this issue for the first time on appeal.

¶45 Generally, we do not consider an evidentiary issue raised for the first time on appeal because failure to object deprives the trial court of the opportunity to prevent or cure any error. RAP 2.5(a); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). A narrow exception exists for "manifest error[s] affecting a constitutional right." RAP 2.5(a)(3); *Kirkman*, 159 Wn.2d at 926. The admission of a witness's opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a manifest

constitutional error. *Kirkman*, 159 Wn.2d at 936. For opinion testimony to qualify as a reviewable manifest error, there must be " 'a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.' " *Kirkman*, 159 Wn.2d at 935 (internal quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

¶46 Here, Curtiss did not object to Detective Wood's testimony that during her interrogation he stated that he thought she was involved in Tarricone's murder. Accordingly, to be able to raise this issue on appeal, she is required to show that the error is manifest and actually prejudiced the jury. *Kirkman*, 159 Wn.2d at 935-36. As an initial point, Wood's testimony merely recounted police statements made during the interrogation process. Like the Ninth Circuit, our Supreme Court has previously held that such statements are an explanation of interrogation tactics and not an expression of personal beliefs. *State v. Demery*, 144 Wn.2d 753, 763-65, 30 P.3d 1278 (2001) (plurality opinion) (citing *Dubria v. Smith*, 224 F.3d 995, 1001-02 & n.2 (9th Cir. 2000), *cert. denied*, 531 U.S. 1148 (2001)).

¶47 But even assuming, which we do not, that Detective Wood's statements during the interrogation were improper opinion testimony, they did not prejudice Curtiss. First, the State elicited this evidence to rebut the defense's cross-examination. *State v. Bourgeois*, 133 Wn.2d 389, 402, 945 P.2d 1120 (1997); *see United States v. LeFevour*, 798 F.2d 977, 983 (7th Cir. 1986) (noting prosecution in a criminal case may "pull the sting of cross-examination" by asking damaging questions of its witness on direct examination); *State v. Hatupin*, 99 Wash. 468, 469-70, 169 P. 966 (1918) (trial court properly allowed prosecution on direct examination to ask its witness about incriminating statements in an affidavit in anticipation of cross-examination).

¶48 Moreover, opinion testimony does not constitute reversible error where the trial court properly instructs the jury, as it did here, that it is the sole judge of witness credibility and not bound by witness opinions. *State v.*

*Montgomery*, 163 Wn.2d 577, 595-96, 183 P.3d 267 (2008); *see Kirkman*, 159 Wn.2d at 937-38. Absent evidence that the jury was unfairly influenced, we presume that the jury followed the court's instructions. *Montgomery*, 163 Wn.2d at 596. As in *Montgomery*, there is no showing in this case that Detective Wood's interrogation questions unfairly influenced the jury verdict. Accordingly, even if Wood's statements were improper, Curtiss showed no unfair prejudice resulted from them.

PROSECUTORIAL MISCONDUCT

¶49 Curtiss also alleges multiple instances of prosecutorial misconduct. She challenges (1) the State's eliciting of Detective Wood's opinion of her guilt and veracity during her prearrest interrogation, (2) the State's analogizing its beyond-a-reasonable-doubt burden of proof to putting a puzzle together, and (3) the State's closing statements urging the jury to trust its gut and to search for and speak the truth. Curtiss's prosecutorial misconduct claims fail.

¶50 To establish prosecutorial misconduct, the defendant bears the burden of establishing that the conduct complained of was both improper and prejudicial. *State v. Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). Prejudice is established only where " 'there is a substantial likelihood the instances of misconduct affected the jury's verdict.' " *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996)).

¶51 Without a proper timely objection at trial, a defendant cannot raise the issue of prosecutorial misconduct on appeal unless the misconduct was so flagrant and ill intentioned that no curative jury instruction could have corrected the possible prejudice. *State v. Gentry*, 125 Wn.2d 570, 640, 888 P.2d 1105, *cert. denied*, 516 U.S. 843 (1995); *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995). That defense counsel did not

object to a prosecutor's statement "suggests that it was of little moment in the trial." *State v. Rogers*, 70 Wn. App. 626, 631, 855 P.2d 294 (1993), *review denied*, 123 Wn.2d 1004 (1994).

¶52 We review a prosecutor's closing argument in the context of the issues in the case, the total argument, the evidence addressed in the argument, and the jury instructions. *Dhaliwal*, 150 Wn.2d at 578. During closing argument, a prosecutor has "wide latitude in drawing and expressing reasonable inferences from the evidence." *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). The State is allowed to draw inferences from the evidence "as to why the jury would want to believe one witness over another." *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995), *cert. denied*, 516 U.S. 1121 (1996).

¶53 Curtiss did not object to any of the conduct that she now alleges was improper; therefore the flagrant, ill intentioned, incurable prejudice standard applies to our review. *Gentry*, 125 Wn.2d at 640; *Russell*, 125 Wn.2d at 85.

¶54 During closing argument, the State reminded the jury that "Detective Wood asked [Curtiss] whether she was upstairs or downstairs when the shooting happened. *She did not deny the accusations.* Instead she responded, quote: I don't remember if I was there. I don't think I was." 8 RP at 603 (emphasis added). We have already determined that Detective Wood's account of Curtiss's response was not reversible error. Moreover, the trial court's finding that Curtiss never invoked her right to remain silent is an unchallenged verity on appeal. Accordingly, the State's eliciting of this information at trial and referencing it during closing arguments was not misconduct and cannot be characterized as an improper comment on Curtiss's right to remain silent.

¶55 Moreover, taken in context, the statements concerned Curtiss's credibility. At trial, Curtiss denied involvement in, and her presence at, Tarricone's murder. These denials contrasted sharply with Curtiss's (1) lack of response to Detective Wood's questions during her interroga-

tion and (2) frequent responses of "I don't know if I was there. I can't remember" and "I don't think I was" during the questioning. 6 RP at 173. Thus, the State properly argued Curtiss's incredibility, drawing allowable inferences based on the evidence presented at trial. *Brett*, 126 Wn.2d at 175.

¶56 Next, Curtiss challenges the State's closing argument describing its burden:

> [R]easonable doubt is not magic. This is not an impossible standard. Imagine, if you will, a giant jigsaw puzzle of the Tacoma Dome. There will come a time when you're putting that puzzle together, and even with pieces missing, you'll be able to say, with some certainty, beyond a reasonable doubt what that puzzle is: The Tacoma Dome.

8 RP at 640-41.

¶57 In context, the State used an analogy to describe the relationship between circumstantial evidence, direct evidence, and the beyond-a-reasonable-doubt burden of proof. The arguments did not shift the burden, nor were they flagrant or ill intentioned. Moreover, Curtiss has not shown that she was prejudiced in light of the trial court's proper instruction on the State's burden of proof and the instruction that the "lawyers' statements are not evidence. . . .The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." 3 CP at 419. We presume that the jury follows the court's instructions. *State v. Stein*, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

¶58 All the cases that Curtiss cites supporting her puzzle analogy challenge are distinguishable. Most are cases from other jurisdictions that involved challenges to jury instructions on the State's burden of proof. Curtiss's comparison to *State v. Anderson*, 153 Wn. App. 417, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010), also fails. In *Anderson*, we held that closing arguments comparing "the certainty people often require when they make everyday decisions . . . trivialized and ultimately failed to

convey the gravity of the State's burden and the jury's role in assessing its case against Anderson." 153 Wn. App. at 431. The State's closing argument in *Anderson* compared the reasonable doubt standard to the choice of getting elective dental surgery where, " '[i]f you go ahead and do it, you were convinced beyond a reasonable doubt' " that you needed it. 153 Wn. App. at 425. Here, the State's comments about *identifying* the puzzle with certainty before it is complete are not analogous to the weighing of competing interests inherent in a *choice* that individuals make in their everyday lives.

¶59 Last, Curtiss asserts that the State improperly told the jury to (1) search for and speak the truth and (2) trust its gut. Specifically, Curtiss challenges the end of the State's closing argument:

> The word "verdict" in Latin means "to speak the truth." We ask that you return a verdict that you know speaks the truth, a verdict of guilty to Murder in the First Degree.

8 RP at 642. Curtiss also challenges the following part of the State's rebuttal argument:

> This trial is a search for the truth and a search for justice, and the evidence in this case is overwhelming. [Curtiss] is guilty of Murder in the First Degree as an accomplice. Consider all the evidence as a whole. Do you know in your gut—do you know in your heart that Renee Curtiss is guilty as an accomplice to murder? The answer is yes.
>
> We are asking you to return a verdict that you know is just, a verdict of guilty to Murder in the First Degree.

9 RP at 686.

¶60 Urging the jury to render a just verdict that is supported by evidence is not misconduct. Moreover, courts frequently state that a criminal trial's purpose is a search for truth and justice. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (stating that an attorney's interest " 'in a criminal prosecution is not that it shall win a case, but that justice shall be done' "

(quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935))); *State v. Gakin*, 24 Wn. App. 681, 686, 603 P.2d 380 (1979) (stating that the "search for the truth" is the "ultimate objective of a criminal trial"), *review denied*, 93 Wn.2d 1011 (1980). Accordingly, the State's gut and heart rebuttal arguments in this case were arguably overly simplistic but not misconduct.

¶61 To the extent that Curtiss argues that the State's rebuttal argument and referencing of the jury's gut and heart appeals to the jury's emotion, we disagree. The trial court specifically instructed the jury to reach a decision "based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference. To assure that all parties receive a fair trial, you must act impartially with an earnest desire to reach a proper verdict." 3 CP at 420. We presume the jury followed this instruction; Curtiss has not shown prejudice stemming from the prosecutor's rebuttal argument. *Stein*, 144 Wn.2d at 247. Moreover, Curtiss has failed to show that the alleged errors to which she did not object could not have been cured by an additional jury instruction. *Gentry*, 125 Wn.2d at 640; *Russell*, 125 Wn.2d at 86.

INEFFECTIVE ASSISTANCE OF COUNSEL

¶62 Curtiss attempts to circumvent preservation requirements to some of her challenges in this appeal by claiming that her trial counsel was ineffective for failing to object to the errors she now raises. We reject this claim because trial counsel had a clear tactical plan and Curtiss has failed to show any prejudice from trial counsel's performance.

¶63 We begin our ineffective assistance of counsel analysis with the strong presumption that counsel was effective. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To establish ineffective assistance of counsel, Curtiss must show that (1) her counsel's performance was deficient and (2) the deficient

performance resulted in prejudice. *Strickland*, 466 U.S. at 687; *McFarland*, 127 Wn.2d at 334-35. A defendant cannot argue ineffective assistance of counsel simply because a legitimate trial tactic failed to sway the jury in her favor. *State v. Grier*, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011).

¶64 None of trial counsel's alleged failures to object were deficient performance. Curtiss argues that her counsel should have objected to (1) Detective Wood's and the State's improper comments on her silence, (2) Wood's testimony about interrogation statements evaluating her veracity and guilt, and (3) the State's closing argument statements. But part of Curtiss's defense was challenging the credibility and competency of the police investigation, witness testimonies, and physical evidence. And trial counsel needed evidence of the police conduct during interrogation to support this claim. As such, trial counsel's conduct was a legitimate trial tactic.

¶65 Moreover, in accord with the rest of our opinion, we rejected each of the alleged testimony and closing argument errors, noting that none would have prejudiced Curtiss's case. Because both the deficient performance and prejudice *Strickland* prongs must be proved to support a successful claim of ineffective assistance of counsel, this failure to show prejudice ends our inquiry. *State v. Fredrick*, 45 Wn. App. 916, 923, 729 P.2d 56 (1986).

"CROWD MANIPULATION" TACTICS

¶66 In her SAG, Curtiss argues that the State improperly used psychological "crowd manipulation" tactics to persuade the jury to enter a guilty verdict. Curtiss cites extensively to documents that she attached to her SAG. We do not accept evidence on appeal that was not before the trial court. RAP 9.11; *State v. Madsen*, 153 Wn. App. 471, 485, 228 P.3d 24 (2009), *review denied*, 168 Wn.2d 1034 (2010). Moreover, on direct appeal, we cannot consider matters outside the record. *McFarland*, 127 Wn.2d at 338 n.5 ("a personal restraint petition is the appropriate means of having the reviewing court consider matters outside the record").

LEGALITY OF SENTENCE

¶67 In her SAG, Curtiss also argues that her due process rights were violated by the imposition of a 40-year minimum sentence. Specifically, she argues that the date of Tarricone's murder preceded the SRA and that the indeterminate sentencing scheme under ch. 9.95 RCW governs her sentencing. She asserts that the trial court did not have the statutory authority to impose a mandatory minimum sentence of 40 years but, rather, should have imposed a mandatory 20-year minimum sentence under RCW 9.95.115. We disagree.

¶68 Former RCW 9.95.011(1) allows the trial court to impose a minimum sentence for offenses that were committed before July 1, 1984, and a conviction entered after July 1, 1986. The statute provides that the minimum term "*shall not exceed* the maximum sentence provided by law for the offense of which the person is convicted." Former RCW 9.95.011(1) (emphasis added). Under the first degree murder sentencing statute in effect at the time of Tarricone's murder, the mandatory maximum sentence was "life imprisonment." Former RCW 9A.32.040. Under the plain language of these statutes, the trial court acted within its statutory authority. *State v. Mandanas*, 168 Wn.2d 84, 87, 228 P.3d 13 (2010) (Appellate courts look to a statute's plain language in order to fulfill its obligation and give effect to legislative intent.).

¶69 RCW 9.95.115 does not limit the trial court's sentencing authority as Curtiss argues. RCW 9.95.115 provides that for crimes committed before July 1, 1984, carrying a mandatory life sentence "[n]o such person shall be granted parole unless the person has been continuously confined therein for a period of twenty consecutive years less earned good time." Curtiss believes that because the statute *permits* release after 20 years of confinement, a sentence *must* allow for release after 20 years of confinement. Curtiss's reading of the statute erroneously treats the mandatory *minimum* requirement of 20 years' confinement as its

*maximum.* RCW 9.95.115 actually requires that the indeterminate sentencing review board ensures that a defendant sentenced to a life sentence serves *at least* 20 years of confinement before granting parole. RCW 9.95.115 does not prevent a trial court from imposing a longer mandatory minimum term. Accordingly, the trial court did not exceed its authority when it imposed a mandatory minimum term of 40 years' confinement.

¶70 In accordance with our analysis in this opinion, we affirm Curtiss's conviction and sentence.

WORSWICK, A.C.J., and WILLIAMS, J. PRO TEM., concur.

Review denied at 172 Wn.2d 1012 (2011).