# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74827-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| RANDALL PAULSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: July 3, 2017 |
| | ) | |

MANN, J. — Randall Paulson appeals his conviction for possession of methamphetamine arguing that the State improperly commented on his exercise of his postarrest right to remain silent. Because Paulson voluntarily waived his right to remain silent and chose to respond to police interrogation, we affirm.

## FACTS

### A.    Arrest and Interrogation

Based on three controlled drug buys that were conducted with a confidential informant, the Bellevue Police Department obtained warrants to arrest Paulson and to search his house, vehicle, and phone. On May 26, 2015, Paulson was arrested following a traffic stop.

Detective William Hallifax conducted two interviews with Paulson following his arrest. The first interview occurred at the scene of Paulson's arrest. After being advised of his Miranda[1] rights, Paulson agreed to speak to Hallifax. No one else was present for this first interview and Hallifax did not record it. Hallifax asked Paulson if he had any drugs in his car. Paulson said he didn't. Hallifax then asked if Paulson had any drugs in the safe at his house. Paulson answered "No, my safe is wide open in my bedroom." Hallifax asked where the drugs were. Paulson answered, "There may be some drugs left on my other nightstand."

Immediately after the initial interview with Paulson, police officers executed the search warrant on Paulson's house. In Paulson's room, there were two nightstands on either side of the bed. There was an open safe on one of the nightstands. In this nightstand, a meth pipe, some baggies, and paperwork with Paulson's name on it were found. In the other nightstand, police found "4.5 grams of methamphetamine and packaging material."

After the search, Hallifax interviewed Paulson at the police station. Paulson confirmed that he remembered his Miranda rights and was still willing to talk. During this conversation

> Paulson said he did not use drugs, sell drugs or give anyone drugs. Detective Hallifax explained that controlled buys had been done on him and Mr. Paulson stated that investigators must have been confused. He later stated that he knew people in the neighborhood were frustrated with him, and that he did not want all the homeless people coming to his house.[2]

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[2] Clerk's Papers (CP) at 71.

> He then stated that people were constantly coming to his house asking for dope or wanting to work for dope. Mr. Paulson said he might have given some people drugs in the past when they worked on his home. He said that he was just trying to help drug addicts out when they came over because they were sick.[3]

> When Detective Hallifax asked him why he thought drug addicts were constantly coming to his place asking for drugs, he stated he did not know. Mr. Paulson repeatedly demanded that he get a Pepsi and a cigarette, and if he did, he would tell investigators what they wanted to know. Detective Hallifax said no and asked what drug dealers are in the area. Mr. Paulson responded, "I know all the big drug dealers. I will give you names if you get me a Pepsi." Detective Hallifax ended the interview at this point.[4]

## B.    Pretrial Procedure

Paulson testified at the CrR 3.5 hearing that he asked for an attorney before the second interview and that Hallifax did not provide him one. Paulson argued that his statements at the police station should be suppressed because the police failed to provide the requested attorney. Paulson did not claim that he did not understand his rights or that he had invoked his right to silence. The trial court found Paulson's claim that he had requested counsel "less than credible." The trial court concluded that Paulson was read his Miranda rights, that he understood his rights, that he stated he was willing to speak with investigators, and that he "knowingly, intelligently and voluntarily waived his Constitutional rights, including his right to counsel." Paulson does not challenge the trial court's CrR 3.5 findings or conclusions.

In response to Paulson's ER 403 motion to suppress, the trial court excluded several of Paulson's statements from trial, including: (1) that he did not use drugs or sell

---

[3] CP at 71.
[4] CP at 71.

-3-

drugs, (2) that he knew "all the big drug dealers", (3) that people constantly came over to his house asking for dope, (4) that he might have given some people drugs in the past, and (5) that he tried to help sick drug addicts.

C.    Trial Testimony and Argument

At trial, Hallifax testified that the following occurred at the scene of Paulson's arrest:

> I asked Mr. Paulson if he was willing to speak with us, and he said he was. I confirmed that he understood all of his rights that were read to him, and he said he did understand them. I asked him several questions about the location of drugs in his car, and he said he didn't have any drugs in his car. Then I asked, Do you have them in the safe at your house? And he said, No, my safe is wide open in my bedroom. I said, Where are the drugs. He said, There may be some drugs left on my other nightstand, other than the one that the safe was on.[5]

Hallifax then described the second interview at the police station. The following exchange occurred between the prosecutor and Hallifax:

> [STATE]: Did you tell him what you found at his home?
> [HALLIFAX]: Yes.
> [STATE]: Did he ever deny what you found (inaudible)?
> [HALLIFAX]: No.
> [STATE]: Did he mention anyone else being in his room?
> [HALLIFAX]: No.
> Defense Counsel: Objection.
> The Court: Basis?
> Defense Counsel: Based on pretrial rulings, and rule of completeness.
> The Court: Overruled.
> [STATE]: Did he ever mention anyone else was in his room?
> [HALLIFAX]: No.
> [STATE]: Did he make any statements?
> [HALLIFAX]: Yes. I was asking him several questions, and he repeatedly demanded a Pepsi and a cigarette and he would tell us everything we wanted; but based on the fact that we can't provide bribes, or threats, or

---

[5] Report of Proceedings (RP) (Feb. 17, 2016) at 196.

-4-

promises, or anything like that, I just shut the interview down after the third or fourth time he had asked.[6]

During closing argument, the prosecutor first discussed the initial post-<u>Miranda</u> statements made by Paulson when he was arrested after the traffic stop:

When Detective Hallifax asked him, "Where is your safe or do you have a safe?" He said, "My safe is wide open on my nightstand next to my bed." Detective Hallifax then asked him, "Where are the drugs?" He said, "I may have some drugs in my other nightstand," in a matter-of-fact tone. No questioning. No confusion.[7]

The prosecutor then discussed the subsequent search and the methamphetamine located where Paulson said it would be:

And in the other nightstand was the methamphetamine. His home. His bedroom. His safe. His drugs.[8]

The prosecutor then described the second interview at the police station:

The second interview that Detective Hallifax had. He went back to the station. He asked Mr. Paulson if he [remembered] his rights, if he still understood them, if he was still willing to talk; and Mr. Paulson said he was still willing to talk, that he remembered his rights. Detective Hallifax explained to us this morning that he told Mr. Paulson what they had found in the way of methamphetamine. Mr. Paulson didn't deny it. His response: Demanding a Pepsi and a cigarette, and I'll tell you all you want to know. He didn't deny it. He didn't mention, you know what, that's actually not mine; that's someone else's. You know what, actually, there are these two other people that live there that might have drug backgrounds; that's actually [theirs]. He didn't say that. All he did was demand a Pepsi and a cigarette, and say I'll tell you what you want to know if you get me those things. That was his opportunity.[9]

---

[6] RP (Feb. 18, 2016) at 226-27.
[7] RP (Feb. 18, 2016) at 356.
[8] RP (Feb. 18, 2016) at 356.
[9] RP (Feb. 18, 2016) at 363.

-5-

Paulson's attorney then objected: "Improper argument and comment on Fifth Amendment." The trial court overruled the objection and reminded the jury that lawyer's arguments are not evidence.

The jury returned a guilty verdict. Paulson appeals.

ANALYSIS

I

Paulson asserts that the State improperly commented on his constitutional right to postarrest silence by arguing that he did not deny that the methamphetamine was in his room and by not claiming that the methamphetamine belonged to someone else. We disagree.

Both the United States and Washington constitutions guarantee a criminal defendant the right to be free from self-incrimination, including the right to silence. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; State v. Easter, 130 Wn.2d 228, 922 P.2d 1285 (1996). This right prevents the State from commenting on "the silence of the defendant so as to infer guilt from a refusal to answer questions." State v. Lewis, 130 Wn.2d 700, 705, 927 P.2d 235 (1996); State v. Clark, 143 Wn.2d 731, 764, 24 P.3d 1006 (2001). A defendant has the right to remain silent both prearrest and postarrest; i.e., both before and after a defendant is given Miranda warnings. State v. Burke, 163 Wn.2d 204, 217, 181 P.3d 1 (2008).

"It is well established that Miranda rights must be invoked unambiguously." State v. Piatnitsky, 180 Wn.2d 407, 413, 325 P.3d 167 (2014) (citing Davis v. Unitied States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); State v. Radcliffe, 164 Wn.2d 900, 906, 194 P.3d 250 (2008)). Invocation of the right to remain silent must

be unequivocal and "requires the expression of an objective intent to cease communication with interrogating officers." Piatnitsky, 180 Wn.2d at 412.

Once a defendant invokes the right to silence, "the State may not elicit comments from witnesses or make closing arguments relating to a defendant's silence to infer guilt from such silence." Easter, 130 Wn.2d at 236. However, when a defendant does not remain silent and instead talks to police and answers substantive crime-related questions, the State may comment on what the defendant does not say. State v. Clark, 143 Wn.2d 731, 765, 24 P.3d 1006 (2001); State v. Young, 89 Wn.2d 613, 621, 574 P.2d 1171 (1978). See also State v. Curtiss, 161 Wn. App. 673, 691-92, 250 P.3d 496 (2011).

Young, for example, concerned a prosecution for the bombing murder of a judge. After being arrested and read his Miranda rights, the defendant spoke to postal inspectors about the bombing. During a two-hour car ride, the defendant "was silent much of the time, but did make several damaging comments and asked several inculpatory questions, all of which were testified to by the inspectors." Young, 89 Wn.2d at 619. During closing argument, the prosecutor argued: "Now did you hear in any of the testimony of these two men [referring to the arresting postal inspectors]—think about this—did you hear anyone, in their entire testimony, say that the defendant denied that he mailed the bomb or had anything to do with the construction of it?" Young, 89 Wn.2d at 620 (alteration in original). Our Supreme Court found no error, holding "[t]he prosecutor was entitled to argue the failure of the defendant to disclaim responsibility after he voluntarily waived his right to remain silent and when his questions and comments showed knowledge of the crime." Young, 89 Wn.2d at 621.

Similarly, in Curtiss, after being informed of her Miranda rights, Renee Curtiss agreed to a taped interview concerning the murder of her former boyfriend. Believing the statute of limitations for rendering criminal assistance had expired, Curtiss confessed to rendering criminal assistance by helping to cover up the murder. She provided substantive detail concerning disposal of the body and weapon. She denied being involved with the murder or being present at the time the murder was carried out. Curtiss, 161 Wn. App. at 685-86. At the conclusion of the interview, the detective told Curtiss that he did not believe her and believed that she had asked for the boyfriend to be murdered and was present at the time. Curtiss, 161 Wn. App. at 685-86. During Curtiss's trial for first degree murder, the detective testified that during the interview Curtiss did not react to or deny accusations that she had asked for the murder to be carried out or that she was present in the house at the time of the murder. Division Two of this court found the testimony proper because "Curtiss never invoked her right to remain silent." Curtiss, 161 Wn. App. at 691-92.

Here, like Young and Curtiss, Paulson did not invoke his right to silence. As the trial court's unchallenged findings and conclusions confirmed, Paulson understood his rights, and knowingly, intelligently, and voluntarily waived his rights and spoke with the investigators. Unchallenged findings of fact entered following a CrR 3.5 hearing are verities on appeal. State v. Piatnisky, 170 Wn. App. 195, 221, 282 P.3d 1184 (2012). After being read his Miranda rights, Paulson answered Hallifax's substantive questions and told him where he would find the methamphetamine in his room. Paulson's responses showed knowledge of the crime—possession of methamphetamine. It was

not misconduct for the State to comment on his failure to disclaim responsibility. Young, 89 Wn.2d at 621.

Paulson relies primarily on cases where the defendants clearly exercised their right to silence by not responding to substantive, crime-related questions. For example, in State v. Fuller, 169 Wn. App. 797, 816, 282 P.3d 126 (2012), after being read his Miranda rights, Jaycee Fuller agreed to speak with detectives and answered a series of questions about himself, including the loss of his job, an eviction, and that he had been pawning items. Fuller, 169 Wn. App. at 806. The detective then turned to the details of the murder investigation and informed Fuller that they had a surveillance video showing Fuller getting into the victim's cab and that a hat was later found at the scene of the crime. Fuller did not respond other than to say he would like to see the video. During testimony and closing argument, the State repeatedly referred to Fuller's failure to deny culpability. Fuller, 169 Wn. App. at 807-811.

Division Two of this court reversed Fuller's conviction based on the State's improper comments on his failure to deny the crime. The court held that Fuller had unequivocally invoked his right to silence in response to substantive questioning: "Here, Fuller invoked his right to partial silence in not responding to some of [the detective's] questions or statements during the custodial interrogation. Thus, the State could not elicit testimony or comment on Fuller's partial silence to infer his guilt." Fuller, 169 Wn. App. at 816. The court distinguished Young by pointing out that unlike Young, Fuller had not voluntarily waived his right to silence, and had made statements showing knowledge of the crime. Fuller, 169 Wn. App. at 816.

But unlike Fuller, Paulson did not decline to answer substantive, crime-related questions at any time during his interviews with Hallifax. During the first interview, Paulson responded to substantive crime-related questions such as providing the location of methamphetamine in his room. During the second interview, Paulson continued to respond to Hallifax's questions by offering to provide answers in exchange for a Pepsi and a cigarette.[10] Because Paulson did not unequivocally invoke his right to silence and responded to substantive, crime-related questions. The State did not commit misconduct by commenting on his failure to deny his guilt. Clark, 143 Wn.2d at 765; Young, 89 Wn.2d at 621; Curtiss, 161 Wn. App. at 691-92.

II

The State argues that even if error occurred, Paulson's conviction should not be reversed even under a constitutional harmless error standard. We agree.

The State bears the burden of showing a constitutional error is harmless. This court finds a constitutional error harmless "only if convinced beyond a reasonable doubt any reasonable jury would reach the same result absent the error." Easter, 130 Wn.2d at 242.

Paulson's statements during his initial interview with Hallifax at the time of the arrest was untainted. Similarly, because the search of Paulson's residence was conducted before the second interview, the fruits of the search and observations made during that search were untainted.

---

[10] Paulson also relies on State v. Pinson, 183 Wn. App. 411, 416-17, 333 P.3d 528 (2014); State v. Silva, 119 Wn. App. 422, 81 P.3d 889 (2003); and State v. Knapp, 148 Wn. App. 414, 420, 199 P.3d 505 (2009). But in all three cases, like Fuller, the defendant unequivocally exercised their right to silence by not responding to substantive crime-related questions.

The jury was instructed on the definition of "possession." Jury instruction 9 stated:

> Possession means having a substance in one's custody or control. It may be either actual or constructive. Actual possession occurs when the item is in the actual physical custody of the person charged with possession. Constructive possession occurs when there is no actual physical possession but there is dominion and control over the substance.
>
> Proximity alone without proof of dominion and control is insufficient to establish constructive possession. Dominion and control need not be exclusive to support a finding of constructive possession.
>
> In deciding whether the defendant had dominion and control over a substance, you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the ability to take actual possession of the substance, whether the defendant had the capacity to exclude others from possession of the substance, and whether the defendant had dominion and control over the premises where the substance was located. No single one of these factors necessarily controls your decision.

11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 50.03 (4th ed. 2016).

During Paulson's initial interview, he identified his bedroom as having two nightstands. He told Hallifax that one of the nightstands had an open safe on top of it. Paulson told Hallifax that the he might have drugs in the second nightstand. During the search of Paulson's residence, police found only one bedroom in the house with two nightstands including one with an open safe on top as Paulson described. Police found methamphetamine in the second nightstand, again, just as Paulson described. The bedroom was also full of evidence showing Paulson's dominion and control over the bedroom. On the bed and in the nightstand, police found mail addressed to Paulson,

-11-

other documents with Paulson's name on them, and a credit card with Paulson's name on it.

Considering Paulson told the police exactly where to find drugs in the nightstand in his bedroom, and that there was no evidence linking anyone else to the drugs, any reasonable jury would have convicted Paulson of possession of the methamphetamine even without the challenged evidence and argument related to his failure to deny the crime. Thus, even if the State erred, the error was constitutionally harmless.

III

Paulson also asks that no costs be awarded on appeal. Appellate costs are generally awarded to the substantially prevailing party on review. However, when a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency." RAP 14.2. Here, Paulson was found indigent by the trial court. If the State has evidence indicating that Paulson's financial circumstances have significantly improved since the trial court's finding, it may file a motion for costs with the commissioner.

-12-

No. 74827-1-I/13

We affirm.

Mann, J.

WE CONCUR:

Spearman, J.

Schindler, J.

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 JUL -3 AM 9: 18