# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  47012-8-II |
| Respondent, | |
| v. | |
| JAMASON C. TEDDER, | PUBLISHED IN PART OPINION |
| Appellant. | |

SUTTON, J. — Jamason C. Tedder appeals his convictions and sentence for second degree assault, felony harassment, and unlawful imprisonment.  Tedder argues that, because he suffers from a mental health condition, the trial court erred when it failed to determine whether he had the ability to pay $2,125 in imposed mandatory and discretionary legal financial obligations (LFOs).

In the published portion of this opinion, we hold that the trial court erred when it failed to determine whether Tedder had the ability to pay any LFOs as required by RCW 9.94A.777(1) and discretionary LFOs under *Blazina*.[1]  In the unpublished portion, we address and reject Tedder's arguments regarding his convictions.  Accordingly, we affirm Tedder's convictions, but remand for the trial court to reconsider the imposition of any LFOs under RCW 9.94A.777(1) and discretionary LFOs under *Blazina*.

---

[1] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

FACTS

Tedder has an extensive history of mental illness, including diagnoses for schizoaffective disorder, antisocial personality disorder, and bipolar I disorder, and more than two dozen past hospitalizations for mental health treatment.[2] On one or two prior occasions, Tedder appeared in mental health court.

Tedder attended high school until the 10th grade, dropped out, and then earned his GED. Before his arrest, Tedder resided in a number of apartments, including living with his mother. Tedder planned to rent a room from his mother after release. He had a number of jobs in the past including detailing cars, caregiver/certified nurses' assistant, bussing tables, logging, landscaping, and painting. He also reported having worked at a cannery, at a tree farm, and in sewage treatment. Before Tedder's trial, a psychologist described Tedder as "lucid, cognitively intact, and knowledgeable," and determined that he was competent to stand trial. Clerk's Papers (CP) at 98-99.

In February 2014, Tedder was arrested and charged with second degree assault with a deadly weapon, felony harassment, and unlawful imprisonment in relation to an incident involving his then girlfriend, Dolly Sage. A jury found Tedder guilty as charged.

At sentencing, Tedder's counsel disclosed to the trial court that he had represented Tedder a number of times in the past when Tedder had "breaks," and that, after Tedder's admission into mental health court, Tedder became homeless when living with his father did not work out and then hospitalized at Western State Hospital. 3 Verbatim Report of Proceedings (VRP) at 500-01.

---

[2] Tedder was hospitalized on 18 occasions in local hospitals, and hospitalized on 7 occasions in Western State Hospital, a Washington State mental health treatment facility.

The trial court recognized Tedder's difficulties when he was not medicated and acknowledged that Tedder had appeared before the mental health court. The trial court made no further inquiry into Tedder's employment history or his future employment prospects before imposing $600 in mandatory LFOs and $1,525 in discretionary LFOs as a condition of Tedder's sentence. Tedder did not object to the imposition of the LFOs or offer evidence that he was not able to pay them presently or in the future. After sentencing, the trial court found Tedder indigent for purposes of an appeal and entered an order of indigency. Tedder appeals the trial court's imposition of the LFOs.

ANALYSIS

For the first time on appeal, Tedder argues that, because he has a mental health condition, the trial court exceeded its authority in imposing mandatory and discretionary LFOs because it failed to determine whether he had the ability to pay as required by RCW 9.94A.777(1) and our Supreme Court's holding in *Blazina*.

Generally, we may decline to review issues raised for the first time on appeal. RAP 2.5(a). But we exercise our discretion here to consider the imposition of LFOs.

RCW 9.94A.777(1) requires that a trial court determine whether a defendant who suffers from a mental health condition has the ability to pay any LFOs, mandatory or discretionary.

> (1) Before imposing any legal financial obligations upon a defendant who suffers from a mental health condition, other than restitution or the victim penalty assessment under RCW 7.68.035, a judge must first determine that the defendant, under the terms of this section, has the means to pay such additional sums.

3

(2) For the purposes of this section, a defendant suffers from a mental health condition when the defendant has been diagnosed with a mental disorder that prevents the defendant from participating in gainful employment, as evidenced by a determination of mental disability as the basis for the defendant's enrollment in a public assistance program, a record of involuntary hospitalization, or by competent expert evaluation.

RCW 9.94A.777.

Here, as evidenced by his numerous involuntary hospitalizations and treatment in mental health court, Tedder clearly suffers from a mental health condition as defined under RCW 9.94A.777. Tedder's mental health history, his history in mental health court, the fact that he relies on family for housing, and the court's order of indigency suggests that Tedder has no assets. While he self-reported past employment, there was no independent verification that he was actually employed or employable in those positions.

The record suggests that Tedder did not have the current ability to pay any LFOs and that his incarceration and his mental health history could potentially prevent him from holding employment following his release from custody. But the trial court never fully inquired into Tedder's work history, his education, whether he could potentially hold a job in the future, or whether he has any outstanding debts.

In *Blazina*,[3] our Supreme Court remanded the trial court's imposition of *discretionary* LFOs for an individualized determination, even though the defendants had not objected below, because it found that the pernicious consequences of "broken LFO systems" on indigent defendants "demand" that it reach the issue. 182 Wn.2d at 830, 835. Based on this record, Tedder will likely face those same consequences. The record shows that the trial court failed to make an

---

[3] *Blazina* only applies to discretionary LFO's ordered under RCW 10.01.160.

individualized inquiry under *Blazina* into Tedder's ability to pay discretionary LFOs. And, as we analyzed above, the trial court failed to fully inquire into Tedder's ability to pay any LFOs as required under RCW 9.94A.777(1). Thus, we remand to the trial court for reconsideration of the LFOs consistent with RCW 9.94A.777(1) and *Blazina*.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Tedder next argues that (1) he received ineffective assistance of counsel, (2) the prosecutor committed misconduct when she argued facts that were not in evidence and told the jury to listen to their "head, heart, and guts" when deliberating, (3) the trial court's reasonable doubt instruction misstated the jury's duty, and (4) the trial court erred when it failed to find that all three charges were the same criminal conduct. We hold that (1) Tedder's counsel was effective, (2) the prosecutor did not commit misconduct, (3) the trial court's reasonable doubt instruction was proper, and (4) Tedder waived the right to argue on appeal that his assault and harassment convictions constituted the same criminal conduct.

ADDITIONAL FACTS

A. BACKGROUND FACTS

Tedder and Sage lived together in a studio apartment in Longview. On February 21, 2014, as Sage came out of the bathroom of the apartment, Tedder was standing and holding her cellphones with a "cold," "scary," and "blank" look on his face demanding to know about the content on her three mobile phones. 1 VRP at 83. In particular, Tedder was concerned about Sage's contact with her ex-boyfriend, "Oden," and told Sage if she tried to leave the apartment

that he would kill her. 1 VRP at 82. Tedder pinned Sage to the ground and held her head to the ground with his knee.

Tedder threatened to pinch Sage's fingers off with a pair of pliers and to whip Sage with a studded belt if she failed to answer his questions about her phones. Sage attempted to reassure Tedder to prevent further injury, telling him "loving, positive things." 1 VRP at 88.

After six hours of questioning her, Tedder allowed Sage to sleep. But he woke her a short time later, accused her of being a lesbian, forced her to watch pornography, removed her clothes, and had sex with her. Afterwards, Tedder then sat on top of Sage, threatening to gouge out her eyes, to mutilate her breasts and genitals with a broken CD, to kill her and cut her body, to keep her confined, and to torture her.

Over the following week, Tedder physically assaulted Sage approximately five times, and had sex with her two more times. While Tedder was out getting groceries, Sage escaped the apartment and ran to her friend Penny McNeil's house two blocks away.

When Sage arrived at the police department the next day, she was emotionally distraught and terrified, and the officers who interviewed her had a difficult time following her story because she would stop mid-sentence and her story was "fragmented." 2A VRP at 250. Sage told the police officers that Tedder forced her to have sex with him and that she did not resist because she "feared for her life." 2A VRP at 210.

The State charged Tedder with second degree assault with a deadly weapon, felony harassment, and unlawful imprisonment. All the charges carried a special allegation of domestic violence.

6

B. TRIAL

During her two-day testimony, Sage characterized her sexual encounters with Tedder during the week as "rape" three times, stating that she did not resist because she was afraid and that she felt that she had no choice but to have sex with him to prevent him from harming her. 1 VRP at 91, 97. McNeil and the sexual assault nurse examiner (SANE nurse) each stated once in their testimony that Sage said that Tedder raped her. There were no objections to the "rape" statements.

The officers who interviewed Sage after she escaped also testified. Former Longview Police Department Officer Nick Wells testified that he interviewed Sage for 60 to 90 minutes and that Sage was terrified during the conversation and was shaking and not making eye contact. Wells also testified that Sage would become more emotional when she talked about what Tedder did to her. Wells testified that Sage told him that Tedder threatened to gouge her eyes out with a broken CD and that Sage told him that

> she had intercourse with Mr. Tedder multiple times. [Sage] said that she was forced to do that and then that he had grabbed her head and forced her to watch pornography on his television.

2A VRP at 210. Sage also told Wells that Tedder told her that "she was lucky that he didn't put a towel over her face and poor [sic] water on it," that Tedder forced her to repent for her sins and ask forgiveness, that Tedder dragged her on the floor by her hair, and that Tedder threated to kill her if she left the apartment. 2A VRP at 210.

Longview Police Department Patrol Investigator Tori Shelton also testified that he interviewed Sage and that Sage was "emotional," "fragmented," "scattered," and "very distraught" during her interview. 2A VRP at 250. Sage stated that Tedder dragged her around the apartment

by her hair; threatened to harm her with a broken CD, a "multi-tool," and a studded belt; and threatened to kill her if she left the apartment. 2A VRP at 251. Sage also told him that "her boyfriend woke her up and forced her to [watch pornography, and then] he had sex with her." 2A VRP at 252. Defense counsel did not object during either officer's testimony regarding what Sage told them.

Before closing argument, the trial court instructed the jury. Jury instruction no. 2 stated, in relevant part,

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 38. Tedder did not object to the jury instruction.

During closing argument, the prosecutor argued that Tedder confined Sage because he was jealous and wanted power and control. After arguing that Tedder threatened Sage and that Sage was trying to convince Tedder that she loved him, the prosecutor made the following statement,

> Then what does he do when she's convinced? Demonstrate for me how much you love me. Don't just say it, even though I threaten you, don't just say. I'm going to make you show it. And he has sex with her. And she doesn't want to have sex but she doesn't fight back. And you know what? She says that's rape. Because she felt like it was rape, and she didn't have a choice.

3 VRP at 442-43. Defense counsel did not object to this argument.

During closing argument, defense counsel argued the meaning of reasonable doubt from jury instruction no. 2, and stated,

What's an abiding belief? . . . We don't use the word abide very often, I'm not sure I've ever used it other than in a courtroom. . . . Webster says it's something that's firm, maintains over time. . . . [A]n abiding belief is something you have today you wouldn't wake up in three weeks and go, "Oh man." [Y]ou'd be firm in that. And that would be based on evidence and lack of evidence.

3 VRP at 458. Then, in response during rebuttal, the prosecutor stated,

Let's talk about the beyond the reasonable a doubt standard, okay? And the judge read it to you, Defense Counsel read it to you. It's a doubt as would exists [sic] in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. A fact or consideration you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt. Counsel talk[ed] to you about an abiding belief, lasting belief. What does your head, heart, and guts say? If it says he did it, you're convinced beyond a reasonable doubt.

3 VRP at 469-70. Defense counsel did not object.

The jury convicted Tedder as charged, and found that the domestic violence special allegation applied.

C. SENTENCING

At sentencing, the State argued that none of Tedder's convictions for harassment and second degree assault constituted the same criminal conduct and that they should be counted as separate and distinct crimes for sentencing purposes. Tedder responded,

[W]e'd ask the Court to make a finding that the assault and the harassment are the same criminal conduct as the unlawful imprisonment. . . . [N]ot as to each other but as to the unlawful imprisonment. [] I' m not saying the assault and the harassment are the same criminal conduct I'm saying that . . . each the assault and the harassment are the same criminal conduct as the unlawful imprisonment.

3 VRP at 495. When the sentencing court asked counsel to clarify, defense counsel stated that Tedder was asking that the trial court consider each of the assault and harassment crimes the same criminal conduct as the unlawful imprisonment crime, "[a]s opposed to if . . . all three" were considered the same criminal conduct. 3 VRP at 496.

The trial court agreed with Tedder and found that the assault and harassment convictions were the same criminal conduct as the unlawful imprisonment, but were separate from each other. Based on its finding, the trial court calculated Tedder's offender score to be two. Tedder appeals his convictions and sentence.

ANALYSIS

I. INEFFECTIVE ASSISTANCE OF COUNSEL

Tedder argues that he received ineffective assistance of counsel when counsel failed to object to testimony regarding allegations that Tedder raped Sage and to "protracted hearsay repetition" of Sage's allegations. Br. of Appellant at 13. We hold that counsel's performance was not deficient because the testimony regarding Tedder and Sage's sexual encounter was admissible under the rules of evidence, Sage's statements were admissible under the excited utterance hearsay exception under ER 803(a)(2).

A. LEGAL PRINCIPLES

To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient and (2) that the deficient performance resulted in prejudice to the defendant. *State v. Humphries*, 181 Wn.2d 708, 719-20, 336 P.3d 1121 (2014) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d. 674 (1984)). Performance is deficient if it falls "'below an objective standard of reasonableness.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *Strickland*, 466 U.S. at 688). The defendant bears the burden of establishing deficient performance and must overcome "'a strong presumption that counsel's performance was reasonable.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). A failure to demonstrate either deficient

performance or prejudice defeats an ineffective assistance claim. *State v. Emery*, 161 Wn. App. 172, 188, 253 P.3d 413 (2011).

Legitimate trial tactics and strategies generally do not constitute deficient performance. *Kyllo*, 166 Wn.2d at 863. And if evidence is admissible, the failure to object is not ineffective assistance. *Nichols*, 161 Wn.2d at 14-15.

B. 404(B) EVIDENCE

Tedder argues that there is no reasonable defense strategy that would explain counsel's failure to object to extensive improper statements that Tedder "raped" Sage. We disagree.

Generally, evidence of other crimes, wrongs, or prior bad acts is not admissible to prove a defendant's character or conformity. ER 404(b). However, ER 404(b) also permits the admission of prior bad acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The evidence must be relevant, and the trial court must balance its probative value against the danger of unfair prejudice.[4] *State v. Slocum*, 183 Wn. App. 438, 448, 333 P.3d 541 (2014). When several acts constitute parts of a plan where each act is a piece of a larger plan, those acts fall under the "plan exception" to ER 404(b). *State v. Lough*, 125 Wn.2d 847, 854, 889 Wn.2d 487 (1995) (internal quotation marks omitted).

Sage testified that after pinning her to the ground, threatening to mutilate and kill her, and questioning her, that Tedder allowed her to sleep for a short time before waking her up and forcing

---

[4] "Before admitting evidence of bad acts, the trial court is required to (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *State v. Slocum*, 183 Wn. App. 438, 448, 333 P.3d 541 (2014) (internal quotation marks omitted). The trial court did not perform this inquiry on the record.

her to watch pornography. Sage testified that Tedder removed her clothes and had sex with her, characterizing the sexual intercourse as rape. Sage testified that she and Tedder had sex at least two more times during the week she was in the apartment, and characterized the intercourse as rape two more times.

Then, McNeil and the SANE nurse each stated once that Sage characterized her sexual intercourse with Tedder as rape. Defense counsel never objected to any of the references to the alleged rape, and the trial court did not conduct a 404(b) analysis on the record. Based on the continued harassment, assault, and unlawful imprisonment, the instances of sexual intercourse, which occurred throughout the duration of Tedder's other crimes, were part of Tedder's larger plan to keep Sage in the apartment. Thus, the evidence was admissible under the plan exception to ER 404(b).

Further, defense counsel's failure to object to the rape testimony could have been a legitimate trial strategy to keep the references to "rape" at a minimum, and to prevent an emotional outburst from Sage. Sage was emotional throughout her testimony, and was particularly agitated during cross-examination, during which she left the stand. Thus, we hold that Tedder fails to show that counsel's performance was deficient and his claim of ineffective assistance of counsel fails.

C. HEARSAY TESTIMONY

Tedder next argues that he received ineffective assistance of counsel when defense counsel failed to object to "protracted hearsay repetition of Sage's allegations by almost every state witness" and that he was prejudiced by his counsel's failure to object. Br. of Appellant at 13. We disagree.

Generally, hearsay[5] is inadmissible unless it falls under one of the exceptions in the rules of evidence. *See* ER 802, 803, 804. A witness's hearsay statement is admissible if it is an excited utterance. ER 803(a)(2). "An excited utterance derives its reliability mainly from the heightened emotional state of the declarant as a result of the startling event, not from the event itself." *State v. Young*, 160 Wn.2d 799, 812-13, 161 P.3d 967 (2007).

"A statement qualifies as an excited utterance if (1) a startling event occurred, (2) the declarant made the statement while under the stress or excitement of the event, and (3) the statement relates to the event." *State v. Magers*, 164 Wn.2d 174, 187-88, 189 P.3d 126 (2008). The first and second elements may be established by evidence extrinsic to the declarant's bare words "such as the declarant's behavior, appearance, and condition, appraisals of the declarant by others, and the circumstances under which the statement is made." *Young*, 160 Wn.2d at 809-10.

Here, the police officers who interviewed Sage testified that she was "terrified," "emotional," and "distraught" during the interview. 2A VRP at 208, 250. Both officers testified that Sage was hard to follow in the interview because she would stop mid-sentence, and she was "fragmented." 2A VRP at 250. The officers testified that during the interview Sage told them that she and Tedder had sexual intercourse multiple times and that she was "forced" to have sex because she "feared for her life."[6] 2A VRP at 210, 252. Defense counsel never objected to either officer's testimony.

---

[5] Hearsay is an out of court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c).

[6] Neither officer used the word "rape" during their testimony to describe Sage and Tedder's sexual encounters.

According to the observations made by the police officers, Sage was still under the stress of the events that had happened the week prior. Significantly, the event was continuing and did not end until Sage escaped shortly before talking with officers. Thus, her hearsay statements during her interview with the police are excited utterances under ER 803(a)(2) and were properly admitted. Therefore, defense counsel's failure to object to their admission was not deficient performance. Accordingly, we hold that Tedder's claim of ineffective assistance of counsel for failure to object on this ground fails.

## II. PROSECUTORIAL MISCONDUCT

Tedder next argues that the prosecutor committed misconduct when she testified to facts not in evidence and mischaracterized the burden of proof during closing arguments. We disagree.

### A. LEGAL PRINCIPLES

The right to a fair trial is a fundamental liberty guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 22; *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial. *Glasmann*, 175 Wn.2d at 703-04.

To prove prosecutorial misconduct, the defendant bears the burden to prove that the prosecutor's comments were both improper and prejudicial in the context of the entire trial. *State v. Lindsay*, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014); *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To establish prejudice, the defendant must prove that there is a substantial likelihood that the misconduct affected the jury's verdict. *Thorgerson*, 172 Wn.2d at 442-43. Failure to object to alleged improper comments, or failure to request a curative instruction, fails to preserve a claim of misconduct unless the comments were "so flagrant and ill intentioned"

14

that no jury instruction would cure any resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Juries are presumed to have followed the trial court's instructions, absent evidence proving the contrary." *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

B. CLOSING ARGUMENT

Tedder argues that the prosecutor committed misconduct by "fabricating statements and attributing them" to Tedder during her closing argument. Br. of Appellant at 16. We disagree.

While the prosecutor has wide latitude in closing argument to draw and express reasonable inferences from the evidence, it is improper to submit evidence to the jury not admitted at trial and to present altered evidence in order to support the State's theory of the case. *State v. Walker*, 182 Wn.2d 463, 476-77, 341 P.3d 976 (2015) *cert. denied* 135 S. Ct. 2844 (2015); *Glasmann*, 175 Wn.2d at 705.

Here, the State's theory of the case was that Tedder committed his crimes out of "jealousy, power, and control." 3 VRP at 430. To support that theory, the State argued that, after Tedder interrogated and threatened Sage for several hours about the contents of her cellular phone, he let Sage rest but was "still jealous," so he woke her up and forced her to watch pornography, have sex with him, and admit "she's into girls." 3 VRP at 442.

To explain Tedder's actions, the prosecutor stated,

> Then what does he do when [Sage is] convinced? Demonstrate for me how much you love me. Don't just say it, even though I threaten you, don't just say. I'm going to make you show it. And he has sex with her. And she doesn't want to have sex but she doesn't fight back.

3 VRP at 442-43. Tedder did not object to this argument.

Sage testified that Tedder "wanted answers to every picture and every message that I had to anybody else," that said he would kill her if she tried to leave the apartment, and that he asked her about her feelings for him. 1 VRP at 83. Sage tried to answer his questions and reassure him telling him "nothing but loving, positive things." 1 VRP at 88. After the questioning and threats went on for several hours, Tedder allowed Sage to "rest" when he felt that her answers were "sufficient." 1 VRP at 89. Later, Tedder woke Sage up, nudging her with a heart-shaped sucker from her friend Jen, and accused her of being a lesbian. Tedder then forced Sage to watch lesbian pornography and admit she was a lesbian, and Tedder took her clothes off and had sex with her. The prosecutor's remarks were a reasonable inference from the evidence that Tedder forced Sage to have sex with him to show him that the loving, positive things she said during the hours-long interrogation and series of threats were true.

Furthermore, these are not the kind of remarks that we find so inflammatory as to be incurable by instruction. *See Emery*, 174 Wn.2d at 763 (citing the prosecutors remarks in *State v. Belgarde*, 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) referring to the American Indian defendant as part of "'a deadly group of madmen'" and "'butchers'" (emphasis and internal quotation marks omitted)). Even if the prosecutor's remarks were improper, Tedder provides no explanation as to why a curative instruction would not have remedied the alleged error. *See Thorgerson*, 172 Wn.2d at 443 (stating that failure to object to an improper remark waives the error unless the resulting prejudice was incurable by an instruction to the jury). Thus, because there is no evidence that the prosecutor's comments were not incurable by instruction, Tedder's claim fails.

C.  MISCHARACTERIZATION OF THE BURDEN OF PROOF

Tedder next argues that the prosecutor mischaracterized the burden of proof during rebuttal argument when she told the jurors to follow their "head, heart, and guts" when rendering a verdict. Br. of Appellant at 19.  The prosecutor's statements were not improper, and if they were, they were curable by a jury instruction.

It is improper for the prosecutor to argue that the burden of proof rests with the defendant. *Thorgerson*, 172 Wn.2d at 453.  The State is entitled to comment upon the quality and quantity of the evidence, which does not necessarily suggest that the burden of proof rests on the defendant. *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014).  Defense counsel's failure to object to alleged prosecutorial misconduct during trial "'suggests that it was of little moment in the trial.'"  *State v. Curtiss*, 161 Wn. App. 673, 698-99, 250 P.3d 496 (2011) (quoting *State v. Rogers*, 70 Wn. App. 626, 631, 855 P.2d 294 (1993)).

In *Curtiss*, the defendant argued that the prosecutor committed misconduct during closing argument when the prosecutor stated,

> This trial is a search for the truth and a search for justice, and the evidence in this case is overwhelming.  [Curtiss] is guilty of Murder in the First Degree as an accomplice.  Consider all the evidence as a whole.  Do you know in your gut—do you know in your heart that Renee Curtiss is guilty as an accomplice to murder? The answer is yes.

*Curtiss*, 161 Wn. App. at 701 (alternation in original).  Noting the trial court's jury instruction, this court held that the prosecutor's remarks were not misconduct and did not appeal to the jury's emotions. *Curtiss*, 161 Wn. App. at 702.

Here, the prosecutor's remarks are similar to those in *Curtiss*. In referring to the reasonable doubt standard, the prosecutor stated,

> [Defense counsel talked] to you about an abiding belief, lasting belief. What does your head, heart, and gusts say? If it says he did it, you're convinced beyond a reasonable doubt.

3 VRP at 470. The prosecutor was responding to defense counsel's argument that

> an abiding belief is something you have today you wouldn't wake up in three weeks and go, "Oh man." [Y]ou'd be firm in that. And that would be based on evidence and lack of evidence.

3 VRP at 458.

These remarks, like in *Curtiss*, were not misconduct and were not designed to appeal to the jury's emotions. Further, Tedder fails to show that the alleged improper statements would not have been cured by a jury instruction. Thus, we hold that Tedder's claim of prosecutorial misconduct fails.

### III. REASONABLE DOUBT JURY INSTRUCTION

Tedder further argues that the trial court's reasonable doubt instruction misstated the law of reasonable doubt, focusing the jury's attention "on whether jurors could provide a reason for any doubts," and "improperly focused the jury on a search for 'the truth.'" Br. of Appellant at 29, 31. We disagree.

As a threshold matter, Tedder did not object to the reasonable doubt instruction proposed and used at trial. Generally, we will not review an error raised for the first time on appeal. RAP 2.5(a); *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). We exercise our discretion here and reach Tedder's argument.

Jury instruction no. 2 is identical to 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01 at 85 (3d ed. 2008) (WPIC). Jury instructions following WPIC 4.01 are constitutional and proper. *State v. Bennett*, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007); *see also Kalebaugh*, 183 Wn.2d at 585-86 (stating that WPIC 4.01 is the "correct" and "proper" instruction for trial court's to give the jury when instructing about reasonable doubt). WPIC 4.01's reasonable doubt instruction reads,

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. [If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.]

WPIC 4.01 (the last sentence is bracketed and optional).

Here, the trial court's reasonable doubt instruction to the jury was identical to WPIC 4.01. CP at 38. The trial court also instructed the jury that the State had the burden to prove the elements of the crime beyond a reasonable doubt, and that Tedder had no burden to prove that reasonable doubt existed. Because the trial court's reasonable doubt instruction was correct and followed WPIC 4.01, and we are bound by the Supreme Court's approval of WPIC 4.01,[7] we hold that the trial court did not err. Thus, Tedder's argument fails.

IV. SAME CRIMINAL CONDUCT

Tedder argues that the sentencing court erred when it failed to consider all of his convictions as the same criminal conduct when calculating his offender score. The State argues

---

[7] Our Supreme Court has determined that WPIC 4.01 is constitutional, and decisions by our Supreme Court are binding on all lower courts in this state. *State v. Ballew*, 167 Wn. App. 359, 369, 272 P.3d 925 (2012) (citing *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 578, 146 P.3d 423 (2006)).

that Tedder waived his right to challenge the trial court's finding on appeal because he agreed that his assault and harassment convictions were not the same criminal conduct and he failed to object to the trial court's determination at sentencing. We agree with the State.

Generally, issues not raised before the trial court may not be raised for the first time on appeal unless it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). Further, a standard range sentence for an offense is not appealable. RCW 9.94A.585(1); *see also State v. Mail*, 121 Wn.2d 707, 710, 854 P.2d 1042 (1993). Illegal or erroneous sentences may be challenged for the first time on appeal. *State v. Nitsch*, 100 Wn. App. 512, 519, 997 P.2d 1000 (2000).

> [I]n general a defendant cannot waive a challenge to a miscalculated offender score. . . . While waiver does not apply where the alleged sentencing error is a *legal error* leading to an excessive sentence, waiver can be found where the alleged error involves an agreement to facts, later disputed, or where the alleged error involves a matter of trial court discretion.

*In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 874, 50 P.3d 618, 625 (2002).

But failure to argue that crimes constitute the same criminal conduct is a "failure to identify a factual dispute for the court's resolution and a failure to request an exercise of the court's discretion." *Nitsch*, 100 Wn. App. at 520. Further, a defendant waives the right to argue on appeal that his crimes constitute the same criminal conduct after the defense agrees that the criminal history as reported is correct. *State v. Bergstrom*, 162 Wn.2d 87, 94, 169 P.3d 816 (2007), *superseded by statute on other grounds*.

Here, Tedder argued, and the trial court found, that his harassment and assault charges each furthered the unlawful imprisonment charge. Tedder's counsel argued for an offender score of two, and asked the trial court to find that the assault and harassment were the same criminal

conduct as the unlawful imprisonment. But counsel also conceded that the assault and harassment were not the same criminal conduct. Conceding that the assault and harassment were not the same criminal conduct, counsel stated that Tedder's offender score should be two versus "if they were all the same criminal conduct as to each other then [Tedder would] have an offender score of zero." 3 VRP at 496.

Based on the record before the court, Tedder agreed to the determination that his assault and felony harassment were not the same criminal conduct, and did not raise the issue before the court or object to the trial court's determination. Thus, Tedder waived his right to argue that his crimes constituted the same criminal conduct on appeal.[8] RAP 2.5(a)(3); *Bergstrom*, 162 Wn.2d at 94.

## V. APPELLATE COSTS

Tedder filed a supplemental brief requesting that, should the State substantially prevail on appeal, we decline to impose appellate costs on him because he is indigent. We exercise our discretion and decline to impose appellate costs on Tedder.

---

[8] Tedder states in a footnote in his brief that counsel's failure to argue that the assault and harassment were the same criminal conduct constitutes ineffective assistance. However, Tedder provides no legal argument or citation to the record as required by RAP 10.3(a)(6) to support his claim that counsel's performance was deficient or that he was prejudiced. Thus, we do not reach this argument.

Under RCW 10.73.160(1), we have broad discretion whether to grant or deny appellate costs to the prevailing party. *State v. Nolan*, 141 Wn.2d 620, 626, 8 P.3d 300 (2000); *State v. Sinclair*, 192 Wn. App. 380, 387-88, 367 P.3d 612 (2016). Under RAP 14.2, we may exercise that discretion in a decision terminating review. We presume a party remains indigent throughout review unless the evidence shows otherwise. RAP 15.2(f).

From the record before us, it appears from the trial court record that Tedder does not have the present ability to pay appellate costs; and, based on his mental health history, it is questionable whether he will be able to pay them upon his release. Further, Tedder's mental health issues may hinder his reintegration into society upon his release from prison. The trial court also entered an order of indigency for this appeal. Under the facts and circumstances of this case, we exercise our discretion and decline to impose appellate costs on Tedder.[9]

## CONCLUSION

We hold that the trial court erred when it failed to determine whether Tedder had the current and future ability to pay the imposed mandatory and discretionary LFOs as required by RCW 9.94A.777(1) and *Blazina*.

---

[9] Our determination is based upon the trial court record. Whether the trial court decides to impose discretionary LFOs on remand after making its additional inquiry should not be affected by our exercise of discretion to not impose appellate costs on Tedder.

No. 47012-8-II

We also hold that (1) Tedder's counsel was effective, (2) the prosecutor did not commit misconduct, (3) the reasonable doubt instruction was proper, and (4) Tedder waived the right to argue on appeal that his assault and harassment convictions constituted the same criminal conduct. Further, we exercise our discretion and decline to impose appellate costs on Tedder. Thus, we affirm Tedder's convictions, but remand to the trial court to conduct the individualized inquiry into Tedder's current and future ability to pay as required under RCW 9.94A.777(1) and *Blazina*.

SUTTON, J.

We concur:

BJORGEN, C.J.

MAXA, J.