# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48946-5-II |
| Respondent, | |
| v. | |
| JOSEPH INGALS GUENTHER, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, P.J. — Joseph Ingals Guenther appeals his jury trial conviction for first degree trafficking in stolen property and his legal financial obligations (LFOs). He argues that (1) the State committed prosecutorial misconduct by arguing facts not in evidence and by asking a witness to comment on another witness's credibility, (2) his trial counsel's failure to object to the State's arguing facts not in evidence amounted to ineffective assistance of counsel, and (3) the trial court erred when it denied his motion for a mistrial based on a witness's comments on another witness's credibility. He also argues that the trial court erred when it imposed LFOs without first considering his ability to pay and asks that we not impose appellate costs. Because Guenther's arguments have no merit and he invited any error with respect to his LFOs, we affirm.

FACTS

I. BACKGROUND

On December 21, 2015, Jefferson County Deputy Sheriff Gordon Tamura was running some personal errands when he noticed two vehicles parked near a wooded area close to his home. After observing a freshly felled maple tree in the wooded area, Deputy Tamura suspected someone was trying to steal the tree.

When Deputy Tamura returned home, he determined that the parcel was owned by a family trust located in the Seattle area. He then contacted Sergeant Mark Lawrence Apeland and told him what he had seen. A short while later, after hearing a saw in the general area where he had observed the tree, Deputy Tamura went to investigate.

When he arrived at the wooded area, Deputy Tamura found Guenther sawing the maple tree. Deputy Tamura asked Guenther if he had permission to be on the property and a permit to harvest trees. Gunther appeared nervous and was initially "unable to answer" these questions. Report of Proceedings (RP) at 125. At one point, Guenther told the deputy that he did not know he had to have a permit and that a friend of a friend had told him that he could fell the tree. He stated that his friend was the one who had permission, but he could not identify his friend. Guenther also told Deputy Tamura that he was cutting firewood, but Deputy Tamura thought that was inconsistent with the "blocking"[1] on the tree. RP at 131. Based on Guenther's answers, Deputy Tamura "detained" Guenther while they waited for assistance. RP at 126.

---

[1] "Blocking" is the term used for sectioning a tree into smaller parts.

Apeland arrived and took over the investigation. While Apeland was talking to Guenther, Guenther's friend, Peter K. Smith, who had been working with Guenther, returned to the area and provided a witness statement.

When Guenther gave Sergeant Apeland inconsistent stories about who owned the property and whether he had permission to be there, Sergeant Apeland arrested Guenther. According to Sergeant Apeland, after he arrested Guenther, Guenther told him that he did not know who the land owner was and that he was going to try to sell the "figured"[2] portion of the tree to the Faith Farm, a mill that cuts "maple blocks down into . . . billets for sale for musical instruments." RP at 147, 153. Guenther said he was planning to cut the remainder of the tree into firewood.

## II. PROCEDURE

The State charged Guenther with first degree trafficking in stolen property.[3] The case proceeded to a jury trial. Smith, Deputy Tamura, Sergeant Apeland, and the trustee of the trust that owned the property testified for the State. Jason D. Cecil, an arborist, was the only defense witness.

## A. TESTIMONY

1.  SMITH'S TESTIMONY

Smith, who had known Guenther since childhood, testified that he worked in residential tree removal, that he had once tried to sell a harvested maple tree, and that only "one in a million trees is worth selling." RP at 106. Smith further testified that if it was "a particularly good cut"

---

[2] Figured wood has a specific type of grain pattern and can be more valuable.

[3] The State also charged Guenther with second degree criminal trespassing, but that charge was dismissed before trial.

of wood, it would "be worth money" and that maple could be used "[f]or instrument wood." RP at 106.

Smith also testified about his activities with Guenther on the day of Guenther's arrest. He testified that Guenther had contacted him and asked if he would "give him a hand" cutting some firewood. RP at 107. When Smith joined Guenther at the wooded lot, Guenther showed him "some stuff" that he (Guenther) thought "might look like it was better than firewood" and told Smith that there might be figuring in the tree.[4] RP at 108. Smith agreed that before the tree was cut Guenther had mentioned that if the tree was figured, he wanted to sell it as "music wood." RP at 110. Smith further testified that once he cut the tree down and they determined that it was not figured, Guenther wanted it to be cut into firewood.

2.    DEPUTY TAMURA'S TESTIMONY

In addition to the facts above, Deputy Tamura testified that the tree was marked in such a way that it was to be cut in sections of "several feet in length, which is more typical with furniture or . . . musical instruments." RP at 122. It was "definitely larger than you would cut for firewood." RP at 122. But he admitted that someone could have continued to cut it into smaller pieces.

3.    SERGEANT APELAND'S TESTIMONY

In addition to the facts above, Sergeant Apeland testified that it is common for Western big-leaf maple to be used for furniture or musical instruments. Sergeant Apeland also agreed that the sectioning marks on the tree were wider than what is typical for firewood.

---

[4] Smith testified that figuring "makes [the wood] really, really pretty and they use it for instruments." RP at 108.

The State then questioned Sergeant Apeland about Smith's behavior, demeanor, and appearance when Smith gave his statement.[5]  Sergeant Apeland testified that Smith seemed "a little shaken but he was very cooperative." RP at 139.  The following then ensued:

[State]        And did [Smith] appear forthright?
[Apeland]     He did.
        [DEFENSE COUNSEL]:     Objection.     Vouching  for  the  witness's credibility, Judge.
        THE COURT: Sustained.  Um, the jury --
        . . . .
        -- the jury will ignore that last question and answer.  Go ahead.
BY [THE STATE]:
[State]        Was there anything about Mr. Smith's behavior at that time that indicated deception?
        [DEFENSE COUNSEL]:     Objection, Judge.  Can you excuse the jury, please?
        THE COURT: Okay.

RP at 139.

After the jury left the courtroom, defense counsel moved for a mistrial based on the State's questioning Sergeant Apeland about Smith's appearance and behavior and the sergeant's response. The trial court denied the motion for mistrial.  Instead, the trial court sustained the second objection.  Defense counsel asked for a curative instruction reminding the jury that it was the sole judge of credibility.

The trial court gave the jury the following curative instruction:

Prior to the jury going out there was an objection by [defense counsel] for the defense that it was improper to, or, there was an objection by [defense counsel] for the defense concerning questions of the officer relating to Mr. Smith's, whether, whether he was straightforward or forthright, or whether he appeared to be deceptive.  Those questions were not proper questions to ask of this officer and, um, any response by the officer would not be proper.

---

[5] Smith's statement, State's exhibit 31, was never admitted and no one testified about the content of the statement.

So, the objection is sustained and the jury will ignore, um, will ignore the testimony of the officer pertaining to whether, whether or not Mr. Smith was straightforward, forthright, or deceptive, or not. And the answers are stricken from the record in that regard.

RP at 146.

Sergeant Apeland then testified that the cut marks on the downed tree were consistent with Guenther's explanation that he planned to take the wood to Faith Farm. He also testified that there was some figuring in the stump portion of the cut tree.

4.      CECIL'S TESTIMONY

Cecil testified that he was a certified arborist and that he was the owner and operator of a tree care company with experience harvesting and selling timber. Cecil reviewed some photographs of the tree and testified that much of it did not contain figuring and was not consistent with wood harvested to make musical instruments. But on cross-examination, he testified that the stump appeared to have burl patterns or figuring throughout and that if he had seen this tree standing, he would have thought there was a possibility it had value based on the wood at the base of the tree. He noted, however, that the burled or figured area had been sawed through and that the tree was not harvested in a way to preserve its value.

B.  JURY INSTRUCTIONS AND CLOSING ARGUMENT

1.      JURY INSTRUCTIONS

After the parties rested, the trial court provided the jury with the jury instructions. The trial court's written and oral instructions instructed the jurors that (1) they were to disregard any evidence that was not admitted or that the trial court struck or asked the jury to disregard, (2) they were the sole judges of credibility of each witness, (3) counsels' remarks, statements, and arguments were not evidence, and (4) the evidence was the testimony and the exhibits.

6

2.      STATE'S CLOSING ARGUMENT

In its closing argument, the State argued that Guenther cut the tree down with the intent to

sell the wood.  During its argument, the State made the following specific arguments:

> Now, you'll recall that *Mr. Smith said that the defendant had wanted to sell the figured part, or, if there was a figured part to Faith Farms*.  Faith Farms, as you heard Sergeant Apeland testify, is a, is an organization or a business down near Quilcene that buys, um, figured maple for resale to *guitar manufacturers*, or other musical instrument makers.

RP at 229 (emphasis added).

> Sergeant Apeland said that he was on the scene when Peter Smith arrived and that Peter Smith seemed upset to see that law enforcement had gotten involved. What you can infer from that is that perhaps he was upset that his friend had lied to him.  That maybe he didn't want to be involved in an illegal enterprise.  *He told Sergeant Apeland that he was cutting the tree into firewood.  Then explained to Sergeant Apeland that he was going to sell the stump which, as Mr. Cecil testified to, was the figured portion of the tree.  He was going to sell it to Faith Farms and then use the rest as firewood.*

RP at 231 (emphasis added).  Guenther did not object to this argument.

Defense counsel argued that Guenther had committed only the lesser offense of third

degree theft, that he had intended to use the tree only for firewood, and that there was no proof

that Guenther intended to sell the tree.  In rebuttal, the State argued,

> So how do we know that Mr. Guenther *intended to sell a part of that tree to Faith Farms*?  We know that because he said so.  *We know that because Mr. Smith said so*.

RP at 243 (emphasis added).  Guenther did not object to this rebuttal argument.

The jury found Guenther guilty of first degree trafficking in stolen property.

## C. SENTENCING

At sentencing, the trial court sentenced Guenther to nine months in jail, with possible work release; it did not impose any community custody. After defense counsel presented the trial court with letters of support from Guenther's employers, the trial court addressed LFOs.

The trial court stated that the mandatory LFOs were $800 and the fee for court-appointed counsel was $600, for a total of $1,400. The court then asked Guenther if he could pay the LFOs:

> You'd have a number of months, or, actually, a number of years to pay this off. The total would be about Fourteen Hundred Dollars. You're able to work, and would you be able to pay that off over the next three or four years?

RP at 266-67. Guenther responded, "Yes." RP at 267. The trial court responded that it would impose $1,400 in LFOs and put Guenther on the "Pay or Appear" program. RP at 267.

The trial court then asked Gunther how much he could pay once he was out of jail, and Guenther responded, "Probably about Fifty Bucks." RP at 267. When the trial court inquired again, Guenther confirmed that he could make these payments and stated that he believed he could continue to work. After this discussion, the trial court imposed a $500 crime victim penalty assessment, a $200 criminal filing fee, a $100 deoxyribonucleic acid fee, and $600 in attorney fees, for a total of $1,400 in LFOs.

Guenther appeals his conviction and his LFOs.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Guenther first argues that the State engaged in prosecutorial misconduct by (1) arguing facts not in evidence and (2) asking Sergeant Apeland to comment on Smith's veracity. Guenther

also argues that defense counsel provided ineffective assistance of counsel by failing to object to the argument referring to facts not in evidence. We disagree.

## A. STANDARDS OF REVIEW

"The Sixth Amendment to the United States Constitution guarantees a defendant a fair trial but not a trial free from error." *State v. Fisher*, 165 Wn.2d 727, 746-47, 202 P.3d 937 (2009). The burden to establish prosecutorial misconduct is on the defendant. *Fisher*, 165 Wn.2d at 747. In analyzing prejudice, we examine the allegedly improper conduct in the context of the total argument, the issues in the case, the evidence, and the jury instructions. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). Prosecutorial misconduct is grounds for reversal only when "there is a substantial likelihood the improper conduct affected the jury." *Fisher*, 165 Wn.2d at 747.

In regard to the alleged misconduct that Guenther failed to object to at trial, however, he is deemed to have waived any error unless he establishes that the misconduct was so flagrant and ill intentioned that it caused an enduring prejudice that could not have been cured with an instruction to the jury and the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012); *State v. Thorgerson*, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011). The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remark. *Emery*, 174 Wn.2d at 762.

Additionally, to prove ineffective assistance of counsel, Guenther must show that (1) defense counsel's performance was deficient, i.e., that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced him, i.e., that there is a reasonable possibility that, but for the deficient conduct, the outcome of the proceeding would have differed.

*State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). This standard is "highly deferential and courts will indulge in a strong presumption of reasonableness" until the defendant shows in the record the absence of legitimate or tactical reasons supporting trial counsel's conduct. *Thomas*, 109 Wn.2d at 226 (citing *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

### B.  ARGUING FACTS NOT IN EVIDENCE AND RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Guenther argues that the State argued facts not in evidence when it argued that (1) maple is a good wood for guitars, (2) Guenther told Smith that he wanted to sell the wood to Faith Farms, and (3) Guenther told Deputy Tamura that he (Guenther) was going to sell the stump because it was figured wood and use the rest of the wood for firewood.[6]  He further argues that these statements were prejudicial because the State had the burden of showing that he intended to sell the wood to others when he initiated, organized, planned, financed, directed, managed, or supervised the theft of the tree, not later, after first cutting the tree down for firewood.

It is improper for the State to argue facts that are not in evidence. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704-05, 286 P.3d 673 (2012).  But the State is allowed to draw reasonable inferences from the evidence. *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

### 1.  STATE'S REFERENCE TO GUITARS

Guenther argues that it was prosecutorial misconduct for the State to argue that maple is a good wood for guitars because there was no such testimony.  The State acknowledges that it

---

[6] Guenther did not object to any of these arguments.

incorrectly referred to "guitars" in closing argument. Br. of Resp't at 9. The record supports this concession because there was no mention of "guitars" in the record; the only references were to "musical instruments." RP at 147.

There was, however, testimony that maple was a good wood for making "musical instruments," so the State could have referred to musical instruments generally. RP at 133. The specific type of instrument was not relevant to any element of first degree trafficking in stolen property—what was relevant was that there was a nearby market at which Guenther could have sold the wood. We hold that mentioning a specific type of musical instrument was a minor misstatement and there was no chance that this misstatement affected the jury's verdict. So, even if Guenther had objected to this misstatement, he fails to show prosecutorial misconduct on this ground.

Guenther also argues that trial counsel provided ineffective assistance of counsel by failing to object to this part of the State's argument. Because, as discussed above, there is no chance this misstatement affected the jury's verdict, Guenther does not establish prejudice on this ground. Accordingly, his related ineffective assistance of counsel argument also fails.

2.    FAITH FARMS ARGUMENT

Guenther next argues that it was prosecutorial misconduct for the State to argue that he told Smith that he wanted to sell the wood to Faith Farms because there was no such testimony. This argument also fails.

Although Smith did not testify that Guenther told him that he wanted to sell the wood to Faith Farms,[7] Smith did testify that Guenther told him that the tree might have figuring and mentioned that if the tree was figured, he wanted to sell it as "music wood." RP at 110. There was testimony that Faith Farms purchased such wood. Thus, this was a reasonable inference from the record and was not improper argument.

Furthermore, to the extent the argument was improper because Smith never expressly mentioned selling the wood in question to Faith Farms, where Guenther intended to sell the wood was not relevant. What was important was that he intended to sell the wood, regardless of where he might have sold it, and we hold that there was no chance that this misstatement affected the jury's verdict. Thus, this prosecutorial misconduct claim fails.

Guenther also argues that trial counsel provided ineffective assistance of counsel by failing to object to this part of the State's argument. Because, as discussed above, there is no chance this misstatement affected the jury's verdict, Guenther does not establish prejudice on this ground. Accordingly, his related ineffective assistance of counsel argument also fails.

3. STUMP ARGUMENT

Guenther next argues that it was prosecutorial misconduct for the State to argue that he told "the officer" that he (Guenther) was going to sell the stump because it was figured wood and use the rest of the wood for firewood because there was no such testimony. Br. of Appellant at 8. Again, this argument fails.

---

[7] We note that it was Sergeant Apeland who testified that Guenther told him he was going to try to cut some of the wood and sell it to Faith Farms.

Sergeant Apeland testified that after he arrested Guenther, Guenther told him that he was going to try to sell the figured portion of the tree and to cut the remainder of the tree into firewood. Although the sergeant did not testify that Guenther referred to the stump, there was other evidence that the stump portion of the tree was where the figured wood was located. Thus, this was a reasonable argument based on the evidence as a whole and was not improper, and this prosecutorial misconduct argument fails.

Guenther also argues that trial counsel provided ineffective assistance of counsel by failing to object to this part of the State's argument. Because, as discussed above, this was not improper argument, any objection by defense counsel would have been futile and defense counsel's failure to object was not deficient performance. *State v. Denny*, 173 Wn. App. 805, 811, 294 P.3d 862 (2013) (appellant does not show ineffective assistance of counsel by failing to make a motion if the motion would have been futile). Accordingly, his related ineffective assistance of counsel argument also fails.

C. QUESTIONING SERGEANT APELAND ABOUT SMITH'S VERACITY

Guenther next argues that the State engaged in prosecutorial misconduct when it elicited inadmissible credibility testimony by asking Sergeant Apeland to comment on Smith's veracity.[8] The State concedes that the State should not have asked Sergeant Apeland whether Smith was forthright or whether anything about Smith's behavior indicated deception. But it argues that the trial court's curative instruction was sufficient to overcome any prejudice. We hold that even assuming that the State's questioning was improper, Guenther fails to show that there is a

---

[8] Guenther does not raise an ineffective assistance of counsel argument related to this argument because defense counsel objected.

substantial likelihood that the State's improper questioning affected the jury's verdict given the trial court's instructions.[9]

"Issues of witness credibility are for the jury alone to decide." *State v. Jungers*, 125 Wn. App. 895, 901, 106 P.3d 827 (2005) (citing *State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992)). But opinion testimony does not constitute reversible error when the trial court properly instructs the jury, as it did here, that the jury is the sole judge of witness credibility and not bound by witness opinions. *State v. Montgomery*, 163 Wn.2d 577, 595-96, 183 P.3d 267 (2008). Absent evidence that the jury was unfairly influenced, such as a written jury inquiry, we presume that the jury followed the court's instructions. *State v. Curtiss*, 161 Wn. App. 673, 698, 250 P.3d 496 (2011) (citing *Montgomery*, 163 Wn.2d at 596).

Here, there is no showing that this improper questioning and Smith's stricken response unfairly influenced the jury verdict. Not only did the trial court give a curative instruction immediately after the improper questioning that instructed the jury to disregard the questions and answer, the jury was advised orally and in the written instructions to disregard stricken testimony and that credibility determinations were the sole province of the jury. Additionally, Sergeant Apeland's assessment of Smith's veracity was not significant because Smith's statement was never admitted and the jury was able to assess Smith's credibility in person when he testified. Thus,

---

[9] Although Guenther argues that we review a claim that improper opinion testimony was admitted for constitutional harmless error, because the issue here is imbedded in a prosecutorial misconduct claim, the prosecutorial misconduct standards apply. *State v. Warren*, 165 Wn.2d 17, 26 n.3, 195 P.3d 940 (2008) (declining to address whether a constitutional error analysis was appropriate when the alleged prosecutorial misconduct violated a constitutional right, noting that the traditional two-part prosecutorial misconduct test "has long been our approach to analyzing prosecutorial misconduct").

Guenther does not show a substantial likelihood that the improper questioning affected the jury's decision, and this prosecutorial misconduct claim fails.

## II. DENIAL OF MOTION FOR MISTRIAL

Guenther further argues that the trial court erred in denying his motion for mistrial because Sergeant Apeland's response to the State's improper credibility questions was so prejudicial. Again, we disagree.

We review a trial court's denial of a motion for mistrial for abuse of discretion. *State v. Garcia*, 177 Wn. App. 769, 776, 313 P.3d 422 (2013). "[A]buse of direction will be found for a denial of a mistrial only when 'no reasonable judge would have reached the same conclusion.'" *Garcia*, 177 Wn. App. at 776 (quoting *Emery*, 174 Wn.2d at 765). "A mistrial should be ordered 'only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly.'" *Garcia*, 177 Wn. App. at 776 (internal quotation marks omitted) (quoting *State v. Rodriguez*, 146 Wn.2d 260, 270, 45 P.3d 541 (2002)). In reviewing the trial court's denial of a motion for mistrial, we examine the *Hopson*[10] factors: (1) the seriousness of the irregularity, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard the irregularity or error. *Garcia*, 177 Wn. App. at 776 (quoting *Emery*, 174 Wn.2d at 765). We accord considerable deference to the trial court. *Garcia*, 177 Wn. App. at 776-77 (citing *State v. Perez-Valdez*, 172 Wn.2d 808, 818, 265 P.3d 653 (2011)).

As discussed above in the prosecutorial misconduct section, (1) the irregularity was not serious because, although commenting on a witness's credibility is improper, Smith's statement

---

[10] *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989).

15

was never before the jury and the jury was able to assess Smith's credibility in person, (2) Smith's testimony was cumulative to Guenther's statements to Deputy Tamura, and (3) the trial court properly instructed the jury to disregard the irregularity and that witness credibility issues were the sole province of the jury. Given this, the State's improper questioning and Sergeant Apeland's response were not prejudicial. Accordingly, we hold that the trial court did not abuse its discretion when it denied Guenther's motion for mistrial.

### III. LFOs

Guenther next argues that the trial court erred when it imposed LFOs without first conducting an adequate inquiry into his current or potential future ability to pay as required by RCW 10.01.160(3).[11] Guenther has waived this argument.

During sentencing, Guenther expressly agreed that he could pay the LFOs and affirmatively stated that he could manage to pay $50 a month. Thus, Guenther invited any error in the trial court not examining his ability to pay more fully, and we will not address this issue further. *See In re Pers. Restraint of Breedlove*, 138 Wn.2d 298, 312, 979 P.2d 417 (1999) (a defendant may not set up error and then complain of it on appeal).

### IV. APPELLATE COSTS

Finally, Guenther requests that we exercise our discretion under RCW 10.73.160(1) and decline to impose appellate costs based on his continued indigency. Under RAP 14.2, a commissioner or clerk of this court has the ability to determine whether appellate costs should be imposed based on the appellant's ability to pay and prior determinations regarding indigency.

---

[11] Guenther does not distinguish between mandatory and discretionary LFOs.

No. 48946-5-II

Accordingly, a commissioner of this court, in due course, will consider whether to award appellate costs under the newly revised provisions of RAP 14.2.

Accordingly, we affirm Guenther's conviction and LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, P.J.

We concur:

MELNICK, J.

SUTTON, J.